**Yusaf Asad MADYUN,**
**Plaintiff-Appellant,**

v.

**Gayle M. FRANZEN, et al.,**
**Defendants-Appellees.**

No. 81–2867.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1982.

Decided April 5, 1983.

955

Ross B. Bricker, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Steven F. Molo, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before PELL, BAUER, and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

Appellant Madyun, an inmate at the Pontiac Correctional Center, Pontiac, Illinois, appeals from a summary judgment entered in the United States District Court for the Central District of Illinois, Harold A. Baker, District Judge, dismissing his civil rights action, pursuant to 42 U.S.C. § 1983 (1976 & Supp. IV 1980), in which he sought damages, as well as declaratory and injunctive relief. Madyun claims that the prison authorities, by punishing him for his religiously-motivated refusal to submit to a "frisk search" by a woman guard, violated his constitutional rights.

We hold that the state may require male prison inmates—even those with religious

* Of the Second Circuit, by designation.

objections—to submit to frisk searches by women guards, that the punishment meted out to Madyun for his refusal to submit was not excessive, and that the state may authorize opposite sex searches of male prisoners without requiring the same of female prisoners. We affirm.

## I.

On March 28, 1978, Madyun, who was serving a 100 to 300 year sentence at Pontiac for murder, reported to the visitors' room at the prison in preparation for a scheduled visit with his wife. Before he was allowed to pass through the security gate into the visitors' area, he was asked by the guard on duty at that gate, a woman officer named D. Howard, to submit to the standard frisk search—an outside-the-clothes check for concealed weapons.[1] Madyun told Officer Howard that he would submit only to a frisk search by one of the male guards who happened to be standing by because Madyun's Islamic religion forbade such physical contact with a woman other than his wife or mother. After this explanation Officer Howard ordered Madyun to submit to her search. He refused to do so. Eventually a male correctional officer had to perform the search. A report was filed citing Madyun for his disobedience of a direct order and an institutional rule. A hearing on this charge was held two days after the incident. Madyun was found guilty of the violation alleged in the report. He thereupon was sentenced by the prison disciplinary committee to 15 days in segregation, i.e. confinement apart from other inmates.

In April 1979 Madyun commenced the instant action against Franzen, then the Director of the Illinois Department of Corrections; Harvey, the Warden at Pontiac; Officer Howard; and the members of the prison disciplinary committee. Madyun claimed in his original and amended complaints that frisk searches by women guards violated his First Amendment rights of privacy and free exercise of his religion, his Fourth Amendment right to be free from unreasonable searches and his Fourteenth Amendment right to equal protection of the laws because female prisoners were not subjected to frisk searches by male guards. He also claimed that 15 days in segregation was so excessive a punishment for his failure to submit to the frisk search that it constituted cruel and unusual punishment in violation of the Eighth Amendment.

Defendants moved for summary judgment on Madyun's First, Fourth, and Fourteenth Amendment claims. Their motion was granted by an order of the district court entered February 15, 1980. Madyun then moved for reconsideration, which the court denied on May 1. Summary judgment on Madyun's remaining Eighth Amendment claim was granted in favor of defendants on October 16, 1981. This appeal followed.

## II.

We need not tarry over Madyun's First Amendment privacy claim or his claim that the frisk procedures performed by women guards on male prisoners were unreasonable within the meaning of the Fourth Amendment. We recently have held that the limited frisk searches by female guards at this same prison did not violate First Amendment privacy rights or Fourth Amendment rights of male inmates. *Smith v. Fairman,* 678 F.2d 52 (7th Cir. 1982).[2]

---

1. Officer Howard in an affidavit gave the following description of her frisk search:

    "The resident is asked to raise his arms. I then run my thumbs under his collar, take my hands and rub them across the top of his arms, come back under his arms to his armpits and down his sides to his waist. I run my finger around his waistband. I run my hands down the outside of his legs and back up to mid thigh. I then reach around and pat his chest area and his back."

2. As we held in *Smith,* and we reiterate here, "... by instructing female guards to exclude the genital areas in conducting a frisk, defendants have afforded plaintiff whatever privacy rights he may be entitled to in this context. While plaintiff evidently finds even this limited touching by a person of the opposite sex to be offensive, we do not read the constitution so broadly." 678 F.2d at 55. Madyun's Fourth Amendment claim is particularly tenuous here.

Madyun attempts to distinguish *Smith* on factual grounds. He claims that the search found constitutionally permissible there was far less intrusive than the search involved here. Specifically, he asserts that the frisk search to which he was subjected required the guard to examine his "genital-anal" area. There is no evidence to support this claim. Even Madyun's description of the search does not amount to a search of the "genital-anal" area.

Madyun alleged in his original complaint that "[a] 'frisk-search' conducted in accord with departmental practice and/or instruction would have entailed defendant Howard's touching plaintiff across his buttocks and between his legs in close proximity to or actual contact with plaintiff's genitals." Taking this *allegation* for the most that it might *suggest,* namely, that frisk searches *might* result in some incidental contact— through a prisoner's clothing—with the genital area, it is a far cry from *proof* that the instant frisk involved a deliberate search of the genital area. The instant case is distinguishable from *Sterling v. Cupp,* 44 Or.App. 755, 607 P.2d 206 (1980), *modified,* 290 Or. 611, 625 P.2d 123 (1981), in which the Oregon Supreme Court struck down, under the state constitution, a frisk search procedure whereby women prison guards manually examined the genital-anal area of male inmates.[3]

The frisk search that Officer Howard was under orders to perform on Madyun on March 28, 1978 (note 1 *supra*) was not significantly different from Madyun's version of the search procedure. In his affidavit in response to Howard's affidavit, Madyun stated, "Defendant Howard's affidavit omits the fact that she ... is required, per department standards, to run her hands along the *inside* of a prisoner's legs well above 'mid-thigh' in the crotch area. Further, she is required to feel across a prisoner's buttocks in the event that he has concealed something in the back pocket of his pants."

■ We hold that there was no disputed material issue of fact. Assuming the truth of Madyun's allegations, the challenged search would have been no more than a simple frisk or pat-down, done outside the clothing, without any deliberate attempt to examine the "genital-anal" areas.[4] Since the search procedure would not have intruded unreasonably on Madyun's First Amendment privacy rights or his Fourth Amendment rights, his refusal to comply with Officer Howard's order was not justified by his reliance on those asserted rights.

### III.

Madyun's three remaining constitutional claims—free exercise of religion, cruel and unusual punishment and equal protection of the laws—present questions that we did not have occasion to consider in *Smith.* We shall discuss each in order.

### FREE EXERCISE OF RELIGION

■ Madyun is a member of the Islamic faith, an established religion. The sincerity of his beliefs is not questioned. Nor is it disputed that even the limited frisk searches conducted by women guards may be incompatible with the tenets of his reli-

---

The Supreme Court has held that even so great an intrusion as body-cavity searches after every contact visit with a person from outside the prison does not violate the prohibition against unreasonable searches. *Bell v. Wolfish,* 441 U.S. 520, 558 (1979). The limited frisk search here involved is a miniscule intrusion in comparison with full inspection of prisoners' body cavities.

3. Madyun points to no case in which opposite sex frisk searches have been held to violate prisoners' *federal* constitutional rights.

4. We express no opinion as to whether more intrusive searches might violate the Fourth Amendment or privacy rights of prison inmates. In view of the Supreme Court's rejection of a challenge to routine visual body-cavity examinations of pre-trial detainees, performed after each contact visit, *Bell v. Wolfish, supra,* 441 U.S. at 558, it is clear that prison administrators are to be accorded considerable deference in their decisions on security measures such as routine searches. *See generally* Note, *Constitutional Limitations on Body Searches in Prisons,* 82 Colum.L.Rev. 1033 (1982).

gion.[5] The question before us, however, is whether the intrusion is justified by a state interest of sufficient magnitude. We hold that it is.

While belief is a citadel into which the state may not intrude, the individual's right of free exercise, although constitutionally protected, always has been balanced against the state's interest in applying its neutral rules of conduct evenhandedly to all citizens. *E.g., United States v. Lee,* 455 U.S. 252 (1982); *Wisconsin v. Yoder,* 406 U.S. 205 (1972); *Sherbert v. Verner,* 374 U.S. 398 (1963); *Reynolds v. United States,* 98 U.S. 145 (1878). Incidental infringement on the exercise of religion that is caused by the application of a state rule or regulation ordinarily may be justified only if the limitation on religious liberty "is essential to accomplish an overriding governmental interest", *United States v. Lee, supra,* 455 U.S. at 257–58, or is required to serve a "compelling" state interest, *Sherbert v. Verner, supra,* 374 U.S. at 403, or an interest "of the highest order", *Wisconsin v. Yoder, supra,* 406 U.S. at 215.

Madyun invites us to analyze this case as an ordinary free exercise case, in which our responsibility undoubtedly would be to determine whether the state had shown a "compelling" interest, or an interest of the "highest order," in having female guards perform frisk searches on male prison inmates. The fact that Madyun is a prison inmate, however, changes the nature of our inquiry significantly; the balance between his right of free exercise and the state's interest in applying to him its prison rules and regulations tips toward the state. As an inmate, Madyun simply cannot expect the same freedom from incidental infringement on the exercise of his religious practices that is enjoyed by those not incarcerated.

It is true that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish, supra,* 441 U.S. at 545. And "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972).[6] But while inmates are not stripped of their constitutional rights at the prison gate, it also is true that these rights properly are subject to a much greater degree of intrusion than would be allowed outside the prison gate. The Supreme Court has made this clear in a series of cases. "[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish, supra,* 441 U.S. at 545. "A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546. *See Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 125 (1977); *Meachum v. Fano,* 427 U.S. 215, 224–25 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 555 (1974); *Pell v. Procunier,* 417 U.S. 817, 822 (1974); *see also Price v. Johnston,* 334 U.S. 266, 285 (1948). As another court of appeals has held, the First Amendment protection is "subject to extensive limitations which would not be applicable were the plaintiffs not prisoners." *Sostre v. McGinnes,* 334 F.2d 906, 908 (2nd Cir.), *cert. denied,* 379 U.S. 892 (1964). In determining what standard is to be applied to Madyun's free exercise claim, we must bear in mind that "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution limits those retained constitutional rights." *Bell v. Wolfish, supra,* 441 U.S. at 546. There must be a

---

**5.** Madyun claims that even the search "as stated in defendant Howard's affidavit ... would violate my religious beliefs and practice."

**6.** The right of prison inmates to free exercise of their religion has been recognized in many different contexts. *E.g., Burgin v. Henderson,* 536 F.2d 501 (2nd Cir.1976) (prisoner's right to grow beard for religious purposes); *United*

*States v. Kahane,* 396 F.Supp. 687 (E.D.N.Y.), *aff'd sub nom. Kahane v. Carlson,* 527 F.2d 491 (2nd Cir.1975) (prison must make allowance for religiously-based dietary restrictions); *Cooper v. Pate,* 382 U.S. 518 (7th Cir.1967) (prisoners' right to religious services); *Walker v. Blackwell,* 411 F.2d 23 (5th Cir.1969) (prisoners' right of access to religious literature).

"mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell, supra,* 418 U.S. at 556.

Two analogous Supreme Court cases illustrate that First Amendment claims of prisoners are to be analyzed under a standard that reflects the fact of incarceration. In *Pell v. Procunier,* 417 U.S. 817 (1974), a group of inmates and journalists challenged a California Department of Corrections regulation that prohibited "press and other media interviews" with individual prisoners, claiming that it violated their First Amendment rights. With respect to the prisoners, the Court upheld the ban on inmate interviews, stating that a prison inmate retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822. In upholding the regulation, the Court relied heavily on the inmate status of the plaintiffs and the substantial deference that was owed to prison authorities. As a result, the Court applied a less stringent standard to the inmates' claim that the prohibition of interviews with the media violated their right of free speech. The fact that alternate means of communication were available to the inmates was enough to save the regulation, although the Court stated that "[w]e would find the availability of [alternative means of communication with the public] unimpressive if they were submitted as justification for government restriction of personal communication among members of the general public. We have recognized, however, that '[t]he relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen,' and that the 'internal problems of state prisons involve issues . . . peculiarly within state authority and expertise.'" *Id.* at 825–26, quoting *Preiser v. Rodriguez,* 411 U.S. 475, 492 (1973).

A year earlier, in *Procunier v. Martinez,* 416 U.S. 396 (1973), the Court addressed the standard to be used in analyzing prisoner claims of infringement of First Amendment rights, specifically infringement of free speech caused by mail censorship. Rejecting the deferential standards proposed by the state, the Court held that the censorship of prisoner mail was justified only if it narrowly served an "important or substantial governmental interest." *Id.* at 413–14.

Although both *Pell* and *Martinez* involved prisoner rights of free speech, their reasoning applies equally to prisoner rights of free exercise of religion. The Supreme Court has not had the occasion to give precise guidance as to the proper standard for analysis of prisoner free exercise claims. Nor have we previously formulated a precise standard. *See Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir.1978) ("All that is required is reasonable accommodation."); *Cooper v. Pate,* 382 F.2d 518, 521 (7th Cir.1967) ("reasonableness"). We are persuaded, however, by the reasoning of *Wolfish, Pell,* and *Martinez* that prisoner free exercise claims must be judged in accordance with a standard different from that applied outside the prison. In view of the special circumstances of incarceration, a "compelling state interest" test, *Sherbert v. Verner, supra,* 374 U.S. at 403, or a test that demands that the state rule serve an interest of "the highest order", *Wisconsin v. Yoder, supra,* 406 U.S. at 215, appears to be inappropriate. We believe that it likewise would be inappropriate for us to defer completely to prison administrators under a broad "reasonableness" standard. As noted above, prisoners do retain free exercise rights. Note 6 *supra.* A reasonableness standard strikes us as not sufficiently sensitive to the legitimate interests of prisoners in adhering to their religious beliefs. A reasonableness standard also does not provide adequate guidance for prison administrators and lower courts.

■ We believe that the appropriate standard for judging prisoner free exercise claims lies somewhere between the extremes outlined above and must provide meaningful guidance. In short, we are persuaded by the reasoning of the Second Circuit and we hold that prison rules that

incidentally restrain the free exercise of religion are justified only "if the state regulation has an important objective and the restraint on religious liberty is reasonably adapted to achieving that objective." *La Reau v. MacDougall,* 473 F.2d 974, 979 (2nd Cir.1972), *cert. denied,* 414 U.S. 878 (1973). *Accord, Mawhinney v. Henderson,* 542 F.2d 1, 3 (2nd Cir.1976); *Burgin v. Henderson,* 536 F.2d 501, 503 (2nd Cir.1976).[7]

The state has a substantial interest in having its women guards perform frisk searches on male inmates. Clearly frisk searches are an integral part of prison security and an important part of a prison guard's duties. If women are not allowed to perform these limited searches—or can perform them only on women inmates—the utility of women prison guards would be significantly diminished. Madyun argues that women can serve the prison system in other capacities. This misses the point. As we observed in *Smith v. Fairman, supra,* 678 F.2d at 54–55, the state is obligated under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(h) (1976 & Supp. IV 1980), to avoid discriminating on the basis of sex in the employment of guards. "If a state is required to hire women as guards in its male prisons, it reasonably seems to follow that it must be allowed to utilize female guards to the fullest extent possible." *Id.* at 54. Equal opportunity for women is a legal obligation of the state. In order to provide such opportunity in state prisons, women employed as guards must be allowed to perform the important tasks required of their male counterparts.

We hold that frisk searches of male prisoners by female guards is reasonably adapted to serve the important state interests of providing adequate prison security and equal opportunity for women to serve as prison guards.

## CRUEL AND UNUSUAL PUNISHMENT

■ Madyun also claims that the penalty imposed by the prison disciplinary committee—15 days in segregated confinement—for his failure to submit to the frisk search was so disproportionate to the severity of the offense that it violated the Eighth Amendment prohibition against cruel and unusual punishment. We disagree.

The punishment here imposed was less than the maximum provided by the prison rules for refusal to obey direct orders.[8] And a short period in segregation as punishment for the breach of an essential prison security rule strikes us as hardly cruel or unusual in its harshness, severity, or disproportionality.

We have not hesitated to hold in appropriate cases that seriously disproportionate punishments meted out by state prison officials may violate the Eighth Amendment.

**7.** Other courts of appeals have applied a wide variety of legal standards to prisoner claims of infringement of free exercise rights. *E.g., Green v. White,* 545 F.2d 1099, 1100 (8th Cir. 1976) (per curiam) (a prisoner "is not allowed, in the name of religion, special privileges not otherwise provided prisoners"); *Teterud v. Burns,* 522 F.2d 357, 359 (8th Cir.1975) ("... a regulation which is more restrictive than necessary to meet the institutional objectives or which does not serve those objectives will be struck down."); *Proffitt v. Ciccone,* 506 F.2d 1020, 1021 (8th Cir.1974) (reasonable regulations may be applied despite religious objection because "[f]reedom of religion can never mean ... freedom to flagrantly disregard reasonable rules of conduct in or out of prison," quoting *Evans v. Ciccone,* 377 F.2d 4, 6 (8th Cir.1967)); *O'Brien v. Blackwell,* 421 F.2d 844, 845 (5th Cir.1970) (per curiam) (extreme deference to prison officials); *Brown v. Wainwright,* 419 F.2d 1376, 1377 (6th Cir.1970) (per curiam)

(unreasonable or arbitrary standard); *Sharp v. Sigler,* 408 F.2d 966, 971 (8th Cir.1969) ("The standard is one of reasonableness").

Several courts of appeals have analyzed prisoner free exercise claims under the *Sherbert v. Verner* "compelling state interest" test. *E.g., Kennedy v. Meacham,* 540 F.2d 1057, 1061 (10th Cir.1976); *Neal v. State of Georgia,* 469 F.2d 446, 450 (5th Cir.1972); *Walker v. Blackwell,* 411 F.2d 23, 25 (5th Cir.1969); *Barnett v. Rodgers,* 410 F.2d 995, 1000 (D.C.Cir.1969).

At least seven different standards for analyzing prisoner free exercise claims have been suggested. *See generally* Comment, *The Religious Rights of the Incarcerated,* 125 U.Pa.L. Rev. 812 (1977).

**8.** Madyun could have received, in addition to the 15 days in segregation, 90 days in "C Grade" and a loss of 30 days of "good time". D.O.C.Adm.Regulation 804(II)(A).

Disproportionality is "partly a question of fact and wholly one of a degree." *Bono v. Saxbe,* 620 F.2d 609, 615 (7th Cir.1980) (citation omitted); *see Chapman v. Pickett,* 586 F.2d 22, 27–28 (7th Cir.1978); *Chapman v. Kleindienst,* 507 F.2d 1246, 1252 (7th Cir. 1974). Unconstitutional disproportionality of punishment, however, generally requires punishment far more severe than 15 days in segregation, usually for offenses less dangerous than refusal to submit to a search. *E.g., Chapman v. Pickett, supra,* 586 F.2d at 28 (7 months in segregation disproportionate to violation involving refusal to perform work as instructed); *Black v. Brown,* 524 F.Supp. 856 (N.D.Ill.1981) (18 months of combined isolation and segregation for running in the prison yard). We have held that the same punishment imposed upon Madyun—15 days in segregation—was not cruel and unusual within the meaning of the Eighth Amendment when it was imposed upon an inmate for an assault upon another inmate with a shovel. *Haines v. Kerner,* 492 F.2d 937, 942 (7th Cir.1974) (per curiam). Refusal to submit to a frisk search, after being ordered to do so, is a serious violation of prison discipline.

In *Chapman v. Kleindienst, supra,* 507 F.2d at 1252, we stated that courts reviewing the proportionality of prison disciplinary measures must consider the "circumstances surrounding the segregation decision", including, first, the circumstances surrounding the offense, second, the prisoner's disciplinary record, and, third, the offense for which he originally was incarcerated. Madyun acknowledges that the district court considered each of these factors. He asserts, however, that the court reached the wrong conclusion.

We hold that application of each of the three *Chapman* factors to the uncontroverted facts in the instant case supports the conclusion that 15 days in segregation was not an excessive punishment for Madyun's violation of the prison rules. First, Madyun was warned that his failure to obey the direct order of a guard would result in punishment. The rule was clearly set forth in the prison regulations. Prison security depends on the ability of the guards to command the cooperation of the inmates, particularly during security checks. Defiance by an inmate in the face of a direct order that he submit to a search presents a challenge to the authority of the guard and hence the security of the prison. In view of the importance of security measures, Madyun's intransigence, even if religiously motivated, cannot be characterized as a trivial infraction. Second, Madyun had compiled a long disciplinary record during his twelve years at Pontiac. He had been the subject of 20 previous violation reports. He asserts that this is not a particularly bad record in the context of the prison environment. Nevertheless, it is evidence of prior disciplinary problems. Third, the underlying crime of which Madyun had been convicted was murder.

We hold that 15 days segregation—punishment less than the maximum provided for this offense under the prison rules—was not so disproportionate as to be cruel and unusual.

## EQUAL PROTECTION OF THE LAWS

Madyun made a rough-hewn equal protection argument in his pro se papers in the district court opposing defendants' motion for summary judgment: "Plaintiff begs defendants to demonstrate to this court a 'compelling state interest' as to why plaintiff cannot be afforded *equal* dignity and respect as that afforded female inmates! why must he be 'frisked-searched' by female officers and male officers be prevented from frisk searching female prisoners!" Since pro se claims are to be liberally construed, *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972), we consider Madyun's equal protection claim to have been made in the district court and to have been rejected by that court.

Under Illinois Department of Corrections regulations, female prisoners are frisk searched only by female guards, while male prisoners are subject to frisk searches by male and female guards. Madyun claims that male prisoners are entitled under the equal protection clause of the Four-

teenth Amendment to be searched by male guards, just as female prisoners are required to be searched by female guards. Clearly, male and female inmates must receive substantially equal facilities and conditions while in prison. *E.g., Glover v. Johnson,* 478 F.Supp. 1075 (E.D.Mich.1979) (vocational programs and facilities); *Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla. 1976) (educational, recreational and visitation opportunities). The right to be searched by a member of one's own sex, however, is hardly a right that can be analogized to the educational, recreational and vocational programs that courts have required prisons to provide on an equal basis. True, there is a disparity in the treatment of the sexes by the Department of Corrections—a distinction drawn on the basis of gender. The facts underlying this distinction are straightforward and well understood. As we have indicated above, prisoners by the very nature of incarceration are subject to indignities and deprivations that would be impermissible outside prison. By the same token, prison administrators should have a reasonable degree of flexibility in affording different treatment to male and female inmates in the interest of security or other legitimate penological functions.

Even under the tests applied to challenged gender-based distinctions outside prison, there is no merit in Madyun's claim that he has been denied equal protection of the laws. The Fourteenth Amendment requires that any gender-based distinction drawn by the state "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976). In the instant case the state's justification for the disparity is as manifest as the disparity in treatment itself. It is well settled that equal job opportunity for women in fields traditionally closed to them is an important governmental objective. "Reduction of the disparity in economic condition between men and women caused by the long history of discrimination against women has been recog-

nized as ... an important governmental objective." *Califano v. Webster,* 430 U.S. 313, 317 (1976) (per curiam) (citations omitted). *See, e.g., Schlesinger v. Ballard,* 419 U.S. 498 (1975) (holding that the Navy can favor women over men by providing a longer period of tenure for female officers in light of past imbalances in opportunity). Indeed, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–h (1976 & Supp. IV 1980), makes this governmental objective particularly important. The state can provide this equal opportunity for women to serve as prison guards in its male prisons, however, only as long as women can perform effectively the tasks essential to the security of the prison. The frisk search is just such an essential task. Here the State of Illinois, in order to provide opportunities for women to serve as guards in its male prisons, has allowed women guards to frisk search male inmates, while male guards may not frisk search female inmates. This differentiation serves the important state interest of equal job opportunity for women, since women prison guards cannot be truly effective unless they can perform the full range of prison security tasks. Conversely, there is no indication that males have suffered a lack of opportunity to serve as prison guards because they are precluded from frisk searching female inmates. In the interest of being able to equalize opportunities for women to serve as guards in male prisons, therefore, the gender-based distinction that allows women guards to search male prisoners substantially advances an important state interest.

This rationale supported the Supreme Court's decision in *Kahn v. Shevin,* 416 U.S. 351 (1974). There the Court upheld a gender-based classification in the Florida tax laws that granted widows a $500 property tax exemption without providing corresponding benefits for widowers. The Court was moved, as it later explained, by its "perception of the laudatory purposes of those laws as remedying disadvantageous conditions suffered by women in economic ... life." *Craig v. Boren, supra,* 429 U.S.

at 198 n. 6.[9] The gender-based distinction here involved likewise has a laudatory purpose, that of eliminating what otherwise might be a substantial impediment to the utilization of women as prison guards. Since the distinction that allows women guards to search male inmates advances this important state interest, we hold that it passes muster under the equal protection clause.

With respect to each of Madyun's constitutional claims, we hold that there was no genuine issue as to any material fact and that defendants were entitled to judgment as a matter of law. Summary judgment was properly entered in favor of defendants.

AFFIRMED.

9. In another case the Court noted: "The gender-based distinctions in the statutes involved in *Kahn* and *Ballard* were justified because the only discernible purpose of each was the permissible one of redressing our society's longstanding disparate treatment of women." *Califano v. Goldfarb,* 430 U.S. 199, 209 n. 8 (1976) (citation omitted).