S. Simcha GOLDMAN,
Plaintiff-Appellee,

v.

SECRETARY OF DEFENSE, et al.,
Defendants-Appellants.

No. 82–1723.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 22, 1983.

Decided May 8, 1984.

As Amended May 8, 1984.

Rehearing En Banc Denied
Aug. 10, 1984

Alfred R. Mollin, Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), and Anthony J. Steinmeyer, Dept. of Justice, Washington, D.C., were on the brief, for defendants-appellants.

Nathan Lewin, Washington, D.C., with whom David J. Butler and Robert A. Smith, Washington, D.C., were on the brief, for plaintiff-appellee.

Before MIKVA and EDWARDS, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge SWYGERT.

SWYGERT, Senior Circuit Judge.

This is an appeal by the Secretary of Defense and the Secretary of the Air Force from the district court's order, 530 F.Supp. 12, enjoining the enforcement of an Air Force dress code regulation that had been invoked to prohibit the plaintiff, an Orthodox Jewish captain, from wearing a yarmulke for religious reasons while in military uniform. Because we believe the Air Force raised sufficient reason for prohibiting deviations from its uniformly applied uniform requirements, we reverse.

## I

S. Simcha Goldman, an ordained rabbi, is an Orthodox Jew who, in accordance with his Orthodox Jewish upbringing, has since childhood observed certain Jewish traditions and laws including keeping his head covered at all times. Between 1970 and 1972 he served as a chaplain in the United States Navy, where he wore a yarmulke as a head covering while in uniform without incident. In 1973 he was admitted into the Armed Forces Health Professions Scholarship Program, which provided assistance for graduate study in exchange for a later commitment to serve on active duty in the armed services. See 10 U.S.C. §§ 2120–2127 (1982). After completing a Ph.D. in clinical psychology in 1977 Goldman entered active service as a captain and was

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

assigned to the Mental Health Clinic of the Air Force Regional Hospital at March Air Force Base, in Riverside, California. Between September 1, 1977, and May 8, 1981, he wore a yarmulke at all times while on duty at March. Neither before his joining the Air Force nor during his first three and one-half years in the service was he informed that wearing a head covering in addition to his uniform was problematic, although he did explain its religious significance to several co-workers and patients who inquired. Throughout his service he received consistently outstanding evaluations in each of ten specified areas from his superiors, including the category "Professional qualities (Attitude, dress, cooperation, bearing)." JA 258–67.

On May 8, 1981, Goldman was summoned by Colonel Joseph Gregory, then the Hospital Commander at March, and was told that wearing a yarmulke while in uniform violated Air Force Regulation ("AFR") 35–10. AFR 35–10 is a meticulously detailed compendium of rules governing the proper wear and combination of uniform items, classified by rank, sex, job function, season, climate, weather, occasion, country or location within a country, and other such classifications. AFR 35–10 § 1–6 generally requires that "Air Force members will wear the Air Force uniform while performing their military duties, except when authorized to wear civilian clothes on duty," and AFR 35–10 § 1–6(h)(2)(f) requires that "[h]eadgear will not be worn ... [w]hile indoors except by armed security personnel in the performance of their duties." Colonel Gregory informed Goldman that wear-

ing a yarmulke in addition to the Air Force uniform, or wearing even a uniform hat indoors, would violate these regulations, and orally ordered him to cease wearing the yarmulke indoors at all places on the base except the hospital, noting that disobedience could subject him to a court-martial. Goldman's request that he be allowed to keep his head covered as required by his religious beliefs was denied. After the meeting Goldman sought legal and religious counsel, and continued to wear a yarmulke. On June 23, 1981, after negotiations by his counsel proved unsuccessful, he was summoned for another meeting with Colonel Gregory, and received a written order to cease wearing the yarmulke anywhere on the base. His request to report for duty in civilian clothing pending legal resolution of the issue was denied. The next day he received a Letter of Reprimand, and sought and received two days' emergency leave when formal processing of the reprimand began. Colonel Gregory also withdrew a recommendation that Goldman's application to extend the term of his active service be approved, and substituted a negative recommendation.

On July 2, 1981, Goldman filed this suit, challenging the regulation on first amendment grounds. The district court granted a temporary restraining order and a preliminary injunction against enforcement of AFR 35–10 pending a full hearing. At the hearing the Air Force argued that strict observance of its regulations, which are detailed and exacting as to the occasions and manner for wearing "headgear,"[1] was

---

**1.** AFR 35–10 § 1–6(h) prescribes the following general rules:

Wear of Headgear:

(1) Air Force personnel in uniform will wear proper headgear when outdoors (including while operating bicycles, mopeds, or similar vehicles, unless safety headgear is worn). Designation of uniform combinations and accessories to be worn during special occasions is a function of local commanders. However, there are times when wear of the service cap for men and beret for women is most proper. For example, members should wear this headgear when greeting and escorting US and foreign dignitaries such as heads of state, ambas-

sadors, attaches, and legislative members. Commanders have the authority to specify other occasions when wear of the service cap (men) and beret (women) is proper.

(2) Headgear will not be worn:
(a) When ordered to uncover.
(b) When wearing required safety gear.
(c) When prohibited by major commanders on their flightlines.
(d) During religious services not associated with a military ceremony (the chaplain conducting a military religious ceremony will give guidance for wearing headgear).
(e) By women in dress uniforms. EXCEPTION: Women will wear the service hat or

necessary to preserve morale (lest other members not excused from observing the

beret with the semiformal uniform or if outer-garments are worn over the informal uniform.

(f) While indoors except by armed security police in the performance of their duties.

(3) The wear of headgear is optional:

(a) While operating or riding in military or privately owned vehicles.

(b) When wearing utility or organizational uniforms in the work area, as directed by the installation commander. A listing of designated areas must be incorporated into local supplements to this directive.

(4) Appropriate safety headgear is required for motorized two-wheeled vehicles and encouraged for bicycles (paragraph 1–16).

*Id.* § 2–5(j) specifies the manner in which certain hats are to be worn as follows:

[The] service hat is worn squarely on the head. [The] flight cap is worn slightly to the right, with vertical crease of cap at center of forehead in a straight line with nose and at point between 1½ inches above the eyebrows. The crown is not crushed.

Special uniform hats for security police are prescribed in *id.* § 4–3(c)(1):

Beret. All security police personnel at group level or below, including instructors at the USAF Security Police Academy, Lackland AFB TX, wear the blue beret, AF Shade 1561, in the following manner:

(a) Headband (edge binding) will be positioned straight across the forehead, 1 inch above the eyebrows. The top of the beret will be draped over the right ear and the stiffener, the command emblem or officer grade insignia, is aligned above the left eye.

(b) Officers wear their metal grade insignia (regular size). They may remove the insignia when it is desirable to subdue the appearance of the wearer. (For example, personnel on deployment or in a local ground defense environment.)

(c) Airmen wear the metallic command emblem affixed to the stiffener on the beret parallel to the edge binding. The bottom of the emblem will be positioned ½ inch from the top of the edge binding. They may remove the command emblem when it is desirable to subdue the appearance of the wearer. (For example, personnel on deployment or in a local ground defense environment.)

(d) The ribbon at the back of the beret will be adjusted for comfort and tied in a knot. Ribbon ends will be cut off at the knot.

Male food service personnel's hats are regulated by *id.* § 4–14(a):

(6) Chef Cap. White, high crown, French Chef style, as authorized in TA 016 or a plain white paper, expendable, high crown, adjustable head size, French Chef style, may be local-

largely arbitrary rules be resentful) and to instill a reflexive sense of obedience essen-

ly purchased for wear. Shift leaders on duty will wear the chef cap; however, they will not wear it outside the duty area.

(7) Food Handler's Cap. White, adjustable head size, expendable as authorized in TA 016. Personnel below the position of shift leader will wear this cap while engaged in food preparation; however, they will not wear it outside the duty area.

. . . .

(10) Headgear:

(a) Flight cap is worn with the basic uniform. This cap may not be worn when the field jacket is worn.

(b) Utility cap is worn with the basic uniform. This cap may not be worn when either the raincoat, all-weather coat or lightweight blue jacket is worn.

(c) Organizational baseball cap, when authorized by installation commander, is worn with the basic uniform. This cap may not be worn when either the raincoat, all-weather coat, or lightweight blue jacket is worn.

Hats to be worn with "functional clothing" are regulated by *id.* § 4–13:

a. As directed by the installation commander, the wearing of headgear is optional in the work area. A listing of designated areas must be incorporated into local supplements to this regulation. Required safety headgear must be worn. When away from the work area, members must wear appropriate military headgear.

b. Airmen do not wear chevrons on their caps.

c. No metallic devices are worn on functional clothing except:

(1) Officers will wear grade insignia on their caps.

(2) Metal grade insignia may be worn on white uniforms (for example, food service, medical, and dental uniforms).

Hats to be worn by other specialized members of the Air Force are regulated by *id.* § 4–11:

a. Members assigned to special operations (commando) units may wear the campaign (bush) hat with the utility uniform.

b. Basic training instructors within Air Training Command (ATC) may wear a blue campaign hat with utility and service uniform combinations.

c. Pararescue members may wear the maroon beret with special beret device, and bloused trousers with combat boots, with all uniform combinations.

d. Combat control team members may wear the scarlet beret with special beret device, and bloused trousers with combat boots, with all uniform combinations.

e. Air Weather Service parachutists may wear the light navy beret with special beret

tial for military order, pride, teamwork, and image. The district court, however, discounted these arguments because the Air Force presented no objective studies to verify the assertion that exceptions for religious reasons would erode morale and obedience. It also credited the evidence presented by Goldman's expert, a military psychologist, who testified that making exceptions to the regulations for worthwhile reasons actually improved morale by dissipating hostility over minor disputes and conveying a sense of humaneness, as the military had found when it excused black members who suffered from pseudofolliculitis barbae (ingrown facial hair) from shaving; and credited Goldman's evidence that his yarmulke was unobtrusive and did not interfere with his work as a clinical psychologist. The district court therefore permanently enjoined the Air Force from prohibiting Goldman to wear a yarmulke while in uniform and from punishing him for refusing to remove it. This appeal followed.

## II

■ The first dispute we must address concerns the proper level of scrutiny with which we must examine the allegedly unconstitutional regulation. Goldman argues that the regulation must be scrutinized strictly and may be upheld only if it is narrowly drawn and justified by a compelling interest, because it affects a fundamental right guaranteed by the free exercise of religion clause of the first amendment. See *Thomas v. Review Board*, 450 U.S. 707, 718–19, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 214, 215, 221, 92 S.Ct. 1526, 1532, 1533, 1536, 32 L.Ed.2d 15 (1972);[2] *Sherbert v. Verner*, 374 U.S. 398, 403, 406–07, 83 S.Ct. 1790, 1793, 1795, 10 L.Ed.2d 965 (1963);[3] see also *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973).[4] The Air Force argues that it should be upheld if it is rational, because military judgments are entitled to special deference. See *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983); *Brown v. Glines*, 444 U.S. 348, 354, 356–57, 100 S.Ct. 594, 599, 600–01, 62 L.Ed.2d 540 (1980); *Parker v. Levy*, 417 U.S. 733, 758, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974);[5] *Orloff v. Willoughby*, 345 U.S. 83, 94, 73

device, and bloused trousers with combat boots, with all uniform combinations.

f. Tactical Air Control personnel may wear the black beret with camouflage fatigues.

g. Military training instructors assigned to the Defense Language Institute English Language Center (DLIELC) may wear the distinctive maroon campaign hat.

AFR 35–10 contains numerous other rules concerning types of hats and manner of wear *passim*.

2. The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. 406 U.S. at 215, 92 S.Ct. at 1533.

3. We must ... consider whether some compelling state interest ... justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. 374 U.S. at 406, 83 S.Ct. at 1795.

4. It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.

5. While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be impermissible outside it.

**1536**

S.Ct. 534, 540, 97 L.Ed. 842 (1953).[6] The Supreme Court discussed a similar dispute concerning the appropriate level of scrutiny of a sex-based classification in the military context in *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). It rejected suggestions that consideration of the weighty interests on each side be used to refine the test under which the classification should be judged (an approach followed by some courts in analogous areas, see, e.g., *Madyun v. Franzen*, 704 F.2d 954, 959–60 (7th Cir.) (judging prisoners' free exercise claims under an intermediate standard), *cert. denied,* —— U.S. ——, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983)), holding instead that

> [a]nnounced degrees of "deference" to legislative judgments, just as levels of "scrutiny" which this Court announces that it applies to particular classifications made by a legislative body, may all too readily become facile abstractions used to justify a result. In this case the courts are called upon to decide whether Congress, acting under an explicit constitutional grant of authority, has by that action transgressed an explicit guarantee of individual rights which limits the authority so conferred. Simply labeling the legislative decision "military" on the one hand or "gender-based" on the other does not automatically guide a court to the correct constitutional result.

453 U.S. at 69–70, 101 S.Ct. at 2654. Under this approach we must simply judge wheth-

er the restrictions on Goldman's right to exercise his religion were authorized and justified by the power of the military to regulate itself, giving due weight to each of the conflicting interests. See also *United States v. Robel*, 389 U.S. 258, 267, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1967) ("We have recognized that, while the Constitution protects against invasions of individual rights, it does not withdraw from the Government the power to safeguard its vital interests.... It is not our function to examine the validity of [a] congressional judgment [that one alternative to the statute in question would be inadequate].... We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake."). This inquiry does not require a "balancing" of the individual and military interests on each side, but rather a determination whether legitimate military ends are sought to be achieved by means designed to accommodate the individual right to an appropriate degree.[7]

The standard of review articulated in *Rostker* is designed for evaluating asserted clashes between individual rights and governmental powers, each specifically provided for by the Constitution. Thus far we have assumed that such rights and powers are involved in this case, but in fact each of the parties here argues that the other's interest is illusory. These preliminary arguments must be evaluated before we turn

**6.** The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

**7.** See *United States v. Robel*, 389 U.S. at 268 n. 20, 88 S.Ct. at 426:

> We recognize that both interests are substantial, but we deem it inappropriate for this Court to label one as being more important or more substantial than the other. Our inquiry is more circumscribed. Faced with a clear conflict between a federal statute enacted in the interests of national security and an indi-

vidual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal. In making this determination we have found it necessary to measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment. But we have in no way "balanced" those respective interests. We have ruled only that the Constitution requires that the conflict between congressional power and individual rights be accommodated by legislation drawn more narrowly to avoid the conflict.

to the merits of the plaintiff's claim. First, the Air Force contends that Jewish law does not require the covering of the head during work, citing G. Appel, The Concise Code of Jewish Law 34 n. 3 (1977), I. Klein, A Guide to Jewish Religious Practice 51–52 (1979), and Goldman's own admission that some Orthodox Jews who consider themselves devout do not feel obliged to cover their heads at all times. It concludes that no free exercise interest is at stake. There is no question, however, that Goldman's religious convictions are sincere, even if not shared by all who profess his faith. The Supreme Court has decisively held that definitive articulation of religious dogma or practice is beyond the competence of secular judicial bodies, and that practices based on religious conviction, even if not universally followed, are protected by the free exercise clause. *Thomas v. Review Board*, 450 U.S. at 715–16,[8] 101 S.Ct. at 1430–31. It is indisputable that covering his head is a protected part of Goldman's exercise of his religion.

■ Conversely, Goldman argues that the Air Force's interest in uniformity is only marginally related in this case to its military mission, because it was acknowledged that Goldman's wearing a yarmulke had no effect on the performance of his duties or on the general esprit de corps at the base. He concludes that because the application of the regulation to him served no military purpose, it was, in effect, not an exercise of the military powers provided for by the Constitution, and deserved little deference. Although we discuss the premise of this argument, that the regulation serves no weighty purpose as applied to Goldman, in greater detail below, it is sufficient to note here that the efficacy or inef-

ficacy of measures allegedly designed to serve a military purpose and taken by those to whom judgment on military affairs is entrusted does not alter their status as military matters, entitled to whatever degree of deference that status entails. *Contrast Frontiero v. Richardson*, 411 U.S. 677, 690–91, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973) (extending no special deference to statutes providing benefits to members of the uniformed services that never purported to be a congressional judgment on a uniquely military matter). For these preliminary purposes, the content of the military decisions is of far less importance than their constitutional source.

■ The source of the power exercised by the Air Force in issuing its regulation is problematic, however, but for a different reason. *Rostker* emphasized that great deference is due to *Congress's* decisions concerning the military, because "Congress is a coequal branch of government whose Members take the same oath [judges] do to uphold the Constitution of the United States," 453 U.S. at 64, 101 S.Ct. at 2651, because the scope of power specifically entrusted by the Constitution to Congress in military matters is broad, *id.* at 64–65, 101 S.Ct. at 2651, and because of the lack of judicial competence in this area, *id.* at 65–66, 101 S.Ct. at 2651–52. See also *Chappell v. Wallace*, 103 S.Ct. at 2366; *Schlesinger v. Ballard*, 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610 (1975); *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973). *But cf. Crawford v. Cushman*, 531 F.2d 1114, 1121 (2d Cir.1976) (finding "no basis for a judicial deference to the military here which precludes review of appellant's substantive constitutional claims" that a Ma-

---

**8.** Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here,

and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

**1538**

rine Corps regulation requiring the discharge of women Marines for pregnancy violated equal protection and due process). As the district court noted, however, JA 17, the actions challenged in this case are not those of Congress, but those of the military, which cannot so readily be assumed to have weighed the competing claims of individual rights and military necessity. See *United States v. Robel*, 389 U.S. at 276–77, 88 S.Ct. at 430–31 (Brennan, J., concurring in result); *Greene v. McElroy*, 360 U.S. 474, 506–08, 79 S.Ct. 1400, 1418–19, 3 L.Ed.2d 1377 (1959); *Korematsu v. United States*, 323 U.S. 214, 244, 65 S.Ct. 193, 206, 89 L.Ed. 194 (1944) (Jackson, J., dissenting). We might therefore be less ready to indulge a presumption that the Air Force regulations accommodate individual rights in a constitutionally acceptable manner, because some of the reasons for such deference are lacking. Nevertheless, the Court has held that decisions made by the military under a delegation from Congress are entitled to deference, because of the specialized nature of judgments concerning internal military governance. See *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 890–94, 81 S.Ct. 1743, 1746–48, 6 L.Ed.2d 1230 (1961). Even though the specific authorization for Air Force dress code regulations, Exec. Order No. 11,390 § 1(7) (Jan. 24, 1968), 33 Fed.Reg. 841 (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 4682, 4683, was purportedly promulgated pursuant to a specific delegation from Congress that had just been repealed, 10 U.S.C. § 8611 (1964), *repealed by* Act of Jan. 2, 1968, Pub.L. No. 90–235, § 8(2), 81 Stat. 753, 764, AFR 35–10 is nevertheless entitled to all the deference due to exercises of validly delegated power, because the Secretary of the Air Force is generally authorized by 10 U.S.C. § 8012(f) (1982) to prescribe regulations necessary to carry out his duties. *Cf. Brown v. Glines*, 444 U.S. at 353–58, 100 S.Ct. at 598–01 (upholding different Air Force regulations). We conclude that this case does involve a clash between constitutionally guaranteed individual rights and constitutionally authorized military power, of the kind addressed in *Rostker v. Goldberg*, and we therefore turn to an examination of the parties' substantive arguments.

The Air Force contends that precise adherence to its uniform requirements is necessary to maintain teamwork, motivation, discipline, esprit de corps, and image, and that making exceptions for any reason would undermine these goals. Goldman argues first that these assertions are based only on past military practice and have not been tested or validated, and second that in any case it is evident that making an exception for him would have no deleterious effect, as shown by the outstanding performance record he compiled during the three and one-half years when his practice of wearing a yarmulke went unchallenged. We discuss the arguments concerning the general validity of the uniform requirements and the feasibility of making exceptions to the regulation in turn.

■ Because in *Rostker* the Supreme Court considered in detail the extensive congressional hearings and reports concerning probable military needs before upholding Congress's decision to exclude women from draft registration, 453 U.S. at 72–83, 101 S.Ct. at 2655–61, Goldman argues that similar verification of the assumptions underlying the Air Force's decision to enforce its dress code regulations against him is necessary before we may uphold that decision. In reaching its conclusion that exceptionless uniformity is beneficial, the Air Force relies on its own experience and on reports that laxity in enforcing such regulations had contributed to lapses in discipline in other branches of the armed services. See Report by the Special Subcommittee on Disciplinary Problems in the U.S. Navy of the House Committee on Armed Services, 92d Cong., 2d Sess. 17,682 (Comm. Serial No. 92–81, 1973); JA 60–66, 71–72; H. Semmes, Portrait of Patton 8 (1955) ("Insistence on strict compliance with uniform regulations

breaks down the barrier ·of resentment to discipline, possibly more than anything else. If men strictly obey the regulations about wearing the uniform, they can be held truly disciplined men."). Its judgment was in the area of military governance, on which its expertise is high and on which judicial competence is low. *Rostker*, 453 U.S. at 70, 101 S.Ct. at 2654. Although we must not abdicate our responsibility to review the constitutional challenge, we cannot lightly substitute our judgment whether a closer accommodation of religious interests would be possible given the legitimate military interests in order and obedience. *Id.* at 70–71, 101 S.Ct. at 2654–55.

Our review of the more particularized arguments concerning the feasibility of making exceptions to the regulations does not persuade us that the Air Force's judgment must be set aside. One of its arguments, it is true, is unpersuasive. General Usher, who testified on behalf of the Air Force at trial, argued that one reason for scrupulous uniformity was safety, because, for example, an unauthorized hat worn on a flight line might fly into a jet engine and cause it to malfunction or explode. JA 63–64. We have no doubt that more narrowly drawn regulations, accommodating religious practices to a greater degree, would satisfy such safety concerns; there is no indication that safety within the Mental Health Clinic was threatened.

Goldman argues that his yarmulke, which was small, dark colored like his hair, and unobtrusive, posed as little danger to morale, appearance, and discipline as it did to safety. The Air Force responds that it is necessary to consider, not the effect of a single exception, but the cumulative effect of numerous exceptions that might be requested, in evaluating the disruptive effects of failure to enforce AFR 35–10. It cites *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 652–54, 101 S.Ct. 2559, 2566–67, 69 L.Ed.2d 298 (1981), in which the Supreme Court upheld a state regulation of the time, place, and manner of solicitation on state fairgrounds because of the likely disruption if the plaintiffs and numerous others proselytized freely, and argues that if members of numerous other religions with distinctive garb flood the Air Force with requests for exemptions, similarly severe disruption would result. It offered a study of religious garb requirements, indicating that various sects require a wide variety of practices, including wearing turbans, robes, face and body paint, shorn hair, unshorn hair, badges, rings, amulets, bracelets, jodhpurs, and symbolic daggers, JA 274–84, to show that the danger of disruption was real. This argument assumes that substantial numbers of members of these sects have enlisted and would be likely to request exemptions, and that the Air Force could not distinguish practices that would not be obtrusive from those that would.

Goldman argues that no showing was made of the representation of these sects in the service, making it impossible to reach any conclusion about likely disruption. Although this argument has some force, the Air Force responds that the study was designed to survey the practices of religious adherents likely to be found in the armed services.

Goldman also argues that a less restrictive means of avoiding disruptive aberrations from the uniform requirements would be to bar only those practices that are actually obtrusive. If a yarmulke like Goldman's is in fact not obtrusive, as the district court found, even widespread adherence to the practice would not be chaotic, unlike *Heffron*, where widespread proselytizing would have posed very real crowd control problems. The Air Force responds that it cannot reasonably distinguish among various religious practices, but must either allow or disallow all requested exceptions. At first blush this response seems weak for two reasons. First, the Supreme Court has not hesitated in the past to assess whether application of a state law to members of a religious group furthers the asserted state interest. In

*Wisconsin v. Yoder*, 406 U.S. at 221–22, 92 S.Ct. at 1536, for example, it held that the state's legitimate interest in promoting self-reliance among its citizens was not furthered by applying its mandatory school attendance law to Amish children, who were adequately trained for a productive life within their own communities. Similarly, in *Thomas v. Review Board*, 450 U.S. at 718–19, 101 S.Ct. at 1432, the Court held that withholding unemployment benefits from a worker who resigned for religious reasons did not further the state's interest in preventing unemployment, because there was no evidence that it would be difficult to distinguish those who resign for personal reasons from those who resign for religious ones. See also *Sherbert v. Verner*, 374 U.S. at 407, 83 S.Ct. at 1795. Moreover, it appears that the Air Force already distinguishes among practices that may be religious, for the regulations permit certain deviations from complete visible uniformity, such as the wearing of rings and bracelets of nonuniform design, see AFR 35–10 § 1–12(b)(1)(b), and have been interpreted to allow the wearing of nonuniform undergarments and ornaments, provided they are not visible beneath the required uniform, despite the existence of military-issue undergarments. The Air Force therefore does distinguish, for example, Mormons who wear "temple garments" underneath their outer clothing from Orthodox Jews, whose religious garb, though visible, is nearly as unobtrusive. If obtrusiveness is the underlying standard actually employed in making these distinctions, the Air Force arguably should be required to employ it in a more thoroughgoing manner, in order to accommodate rights of free exercise to the greatest possible extent. It then would be no answer to assert, as the Air Force does, that wearing rings and special undergarments are not exceptions to the uniform requirements, on the ground that the regulation specifically allows them, because the reason for the difference in treatment of various nonstandardized articles of clothing and ornaments, rather than the fact of the difference, would be at issue.

We are nevertheless persuaded that the peculiar nature of the Air Force's interest in uniformity renders the strict enforcement of its regulation permissible. That interest lies in the enforcement of regulations, not for the sake of the regulations themselves, but for the sake of enforcement. Its regulations are necessarily arbitrary. It is impossible to argue, for example, that a decorative hat of one shape or one color is demonstrably superior to another, although it is possible to argue that enforcement of rules that certain hats may be worn only by certain people or at certain times serves the military purposes of identification and indoctrination into instinctive obedience. Unlike the states in *Wisconsin v. Yoder*, *Thomas v. Review Board*, and *Sherbert v. Verner*, whose interests in enforcing their rules would not be greatly impaired by making exceptions when enforcement would not serve the purpose underlying the rules, the Air Force has no concrete interest separate from the effect of strict enforcement itself. The rules themselves are arbitrary, and are enforced up to an arbitrary cutoff point—the point of visibility. It is nearly inevitable that some religious practices will fall on one side of the line and some on the other. But the Air Force argues that it cannot make exceptions to the cutoff line for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly (and whose resentment would be intensified by the arbitrariness of the rules), thereby undermining the goals of teamwork, motivation, discipline, and the like; and that it cannot move the line, so as to avoid the problem of making exceptions, without losing the benefits of uniformity altogether. It therefore concludes that strict enforcement of its regulations is necessary for its military purposes. Although Goldman's expert testified that making exceptions would defuse rather than cause resentment, the Air Force's judgment on this issue is entitled to deference because it is within its expertise and outside ours.

 The free exercise clause of the first amendment guarantees both the freedom to believe and the freedom to act, but only the former is absolute; conduct is regulable for a permissible reason, provid-

ed that the regulation is not unduly restrictive. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Although Goldman raises serious questions concerning the restrictiveness of the Air Force's regulations and the manner of their enforcement, the Air Force's reason for its rules, particularly in view of their specialized military nature, are sufficient answer. The judgment below is therefore vacated and the case remanded. On remand the district court should determine whether, in light of the difficulty of the issue and the good faith of the parties, equity requires that Goldman's military record be expunged of any negative materials related to the issues in this case.