**Kareem FAHEEM-EL, et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Michael P. LANE, et al., Defendants.**

**Nos. 79-2273, 80-2222, 81-2157 and 81-2158.**

United States District Court, C.D. Illinois.

May 30, 1986.

Reico Cranshaw-El, pro se.

Thomas Peters, Chicago, Ill., for plaintiffs.

Bart Murphy, Thomas Morrissey, Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND FINAL ORDER

BAKER, Chief Judge.

This civil rights litigation poses the question whether persons incarcerated in the Illinois Department of Corrections who are members of the El Rukn Suni Mosque, 3947 South Drexel Boulevard in Chicago, Illinois (formerly Moorish Science Temple of America, El Rukn Tribe) are entitled to hold separate religious services and wear and possess emblems showing membership in their organization.

The individual plaintiffs, Kareem Faheem-El, El Barr-El, Hasib-El, Mohammad C. Ali-El, Mosham Bay-El, Roland Lewis-El, Otis Dorsey-El, Michael Williams-El, and Harvey Costick-El, are convicted felons who are inmates of the Illinois Department of Corrections. They are representative of a class of plaintiffs defined as:

> All members of the Moorish Science Temple of America, El Rukn Tribe, who

are currently incarcerated in an Illinois state penitentiary.[1]

The plaintiffs claim that they are members of a *bona fide* religious organization. They complain that the defendant forbids the plaintiffs to congregate in religious worship services, wear identifying emblems, or possess certain printed materials, and thus the defendant interferes with the plaintiffs' rights to the free exercise of religion under the First Amendment to the Constitution of the United States. The plaintiffs seek only declaratory and injunctive relief. Originally, the plaintiffs also sought money damages, but the parties subsequently limited the relief sought to equitable remedies and consented to trial of the case before the court.[2]

The defendant denies that the plaintiffs are a *bona fide* religious organization. The defendant asserts that the El Rukns are a street gang organized for the pursuit of criminal activities. The defendant admits that he restricts the activities of the El Rukns within the penitentiaries operated by the State of Illinois, but he asserts that the state does so for the legitimate purposes of institutional security and discipline. The plaintiffs' claims are brought under 42 U.S.C. §§ 1983, 1985, and 1986. Jurisdiction is granted by 28 U.S.C. § 1343.

The case has had a history of delay from its inception. The parties have conducted extensive discovery and amended the pleadings several times. Between November 18, 1985, and April 15, 1986, the court heard four days of testimony from twenty-six witnesses. The parties presented oral argument and written briefs. Having considered the evidence and the arguments, the court now makes the following findings of fact and conclusions of law.

*Factual Findings*

Chicago Police Detectives Daniel Brannigan and Richard Peck testified for the defendants. The court credits the testimony of these detective witnesses about the origins and operations of the El Rukns. Detectives Peck and Brannigan are police officers with first hand experience on the street. They have been assigned to gang crime squads on Chicago's South Side for many years and have been involved directly with investigation of the El Rukns and in dealing with its members. They have arrested El Rukns, been shot at by them, and chronicled the organization's activities. Their testimony is persuasive.

The El Rukns' origins go back to the formation of the Black Stone Rangers in the late 1960's on the South Side of Chica-

1. The court's order of November 26, 1982, granting plaintiffs' motion to proceed as a class (Doc. 73), sets forth the rationale for permitting the plaintiffs to proceed as a class.

2. At the inception of this litigation, the original plaintiff in 79–2273 was Reico Cranshaw-El, *pro se,* and the defendant was Gayle Franzen, then Director of the Illinois Department of Corrections. The proceedings in the Central District of Illinois were stayed on December 14, 1979, pending the disposition of two cases in the Northern District of Illinois, *El Rukn Kareem Faheem-El v. Illinois Department of Corrections, et al.,* 79–C–2034, and *El Rukn Mohammad C. Ali-El, et al. v. Gayle Franzen, et al.,* 79–C–3279. On February 20, 1981, the stay order was lifted and on June 18, 1981, the two cases in the Northern District of Illinois were transferred to the Central District of Illinois. In the original Central District cases, the plaintiffs had appeared *pro se,* but on November 2, 1981, Thomas Peters, Esq. entered his appearance on behalf of the plaintiffs, and the parties were realigned in their present positions. Pursuant to Fed.R. Civ.P. 25(d)(1), Michael P. Lane has been substi-

tuted for Gayle Franzen, as Director of the Illinois Department of Corrections. The defendants originally named in the litigation were the Director of the Illinois Department of Corrections and other officials of that government agency who were supervisors of chaplains, wardens, or other correctional officers. In its present stance with relief sought only of an equitable or declaratory nature, the litigation now proceeds only against Michael P. Lane, Director of the Illinois Department of Corrections. Furthermore, because the plaintiff seeks only equitable and declaratory relief, the definition of the class has been modified by the court to eliminate sub-class B as set forth in the original statement of the class:

B. All members of the Moorish Science Temple of America, El Rukn Tribe, who are incarcerated in an Illinois state penitentiary on or after February 14, 1979, and who were subsequently released provided that said persons were members of the Moorish Science Temple of America while incarcerated and they still are members of the Moorish Science Temple of America.

*See* Fed.R.Civ.P. 23.

go. The leaders of the Rangers were Jeff Fort and Eugene Hairston.[3] Fort was the chief of the Black Stone Rangers and he governed the organization through a group called the Main 21. Although the Rangers were a street gang, in their early days they were allowed to meet once a week in the First Presbyterian Church in Woodlawn after church services. They even obtained a federal grant for educational purposes. The Rangers evolved into the Black Peace Stone Nation under the same leadership. As Detective Peck put it, "[t]here was nothing religious about the Black Peace Stone Nation." It was a street gang organized to engage in extortion, robbery, burglary, and prostitution all over the City of Chicago and in the suburbs. The gang had up to 15,000 members, Dectective Peck testified, ranging from 6 to 60 years in age.

Following a Senate investigation into some of this criminal activity, Jeff Fort and five of the Main 21 were indicted. Fort was convicted and he received a prison sentence. At that point, according to Detective Peck, the Black Peace Stone Nation died out and the leaders kept the money they had received from the gang activities.

In 1976, Detective Peck says, Jeff Fort was released from prison. When Fort returned to Chicago, the El Rukns were formed. Detective Peck says the people who are members of the El Rukn organization are in large part the same people who were members of the Black Peace Stone Nation. Peck says the El Rukns are carrying out the same activities as the Peace Stones but the El Rukns are now more sophisticated and do not engage in violence except for furtherance of the gang's activities and for economic advantage.

Detective Brannigan agrees with Detective Peck. Brannigan describes the El Rukns as a sophisticated street gang with a leader and hierarchy of members organized to engage in criminal activity. The leader of the El Rukns is Jeff Fort who is also referred to as "Chief Malik" or "The King Angel."

In his youth, Brannigan says, the membership would engage in violence for its own sake. Now that the members are thirty, forty, and fifty years of age, however, their violence is directed toward financial gain. The hierarchy of the El Rukn organization, Brannigan testified, is similar to the hierarchy of the Black Peace Stone Nation. Jeff Fort and the Main 21 of the Rangers and Jeff Fort and the "Generals" of the Peace Stone Nation have been succeeded by Jeff Fort (Chief Malik) and the Emirs of the El Rukns. It is still Jeff Fort and the hierarchy that determine the right to membership in the organization and discipline dissident members.

The sphere of influence of the organization now extends from 39th Street to 7900 South in Chicago and includes operations in Harvey, Evanston, and Milwaukee. If a person wishes to engage in criminal activity within the El Rukn sphere of influence, that person must pay tribute to the El Rukns. Detective Brannigan testified that the El Rukns assassinate those who fail to pay tribute. Brannigan says the standard procedure is for masked assassins to walk up to the victim and empty their guns into him. Approval of an assassination must come from Jeff Fort.

The El Rukns control several parcels of real estate in Chicago in addition to the mosque at 3947 South Drexel Boulevard. The buildings display El Rukn symbols and the El Rukn colors: black, red, and green. Detective Brannigan has participated in court sanctioned raids on these properties between 1978 and 1985. The properties are fortified and the police have been required to use force to gain entry. Searches have resulted in the seizure of firearms, ammunition, and controlled substances. The El Rukns, in Brannigan's opinion, are an ongoing criminal enterprise with about 250 to 300 adult, male members.[4] About 90 per-

3. Hairston was convicted of solicitation to commit murder in the late 1960's or early 1970's. Fort is presently serving a sentence in a federal penitentiary for conspiracy to distribute cocaine. Fort had been convicted previously in 1972 of misappropriating about $980,000 in funds from a federal grant given to the Black Peace Stone Nation for educational purposes.

4. The women and children associated with the El Rukns, Brannigan says, have become visible

cent of the members have been convicted of felonies. Brannigan estimates that the organization has been responsible for over 100 felonies including murder, narcotics trafficking, and weapons violations.

Assistant Deputy Director Richard DeRobertis and Warden James W. Fairman testified about the activities of the El Rukns and other gangs within the Department's institutions, and about the continuing threat to institutional security and discipline that gang activity creates. Warden Fairman observed the attempts by street gangs within the prisons to intimidate other inmates and the staff. The gangs seek power by means of extortion and violence and confrontation with the correctional officers. Director DeRobertis recounted an occurrence at Stateville in June, 1984, when an informant, an admitted and known El Rukn, reported that the El Rukns had smuggled firearms into the institution to settle an intra-organization dispute. The guns were located and confiscated. Randy Dillard, a class member, an admitted El Rukn member and a "General" in the organization, testified in a state court proceeding concerning a conspiracy by El Rukns to commit murder.[5] This testimony is persuasive that members of the El Rukn organization engage in continued criminal activity while incarcerated. It is Warden Fairman's opinion, which I credit, that any official recognition given a street gang would enhance the gang's prestige within a prison and tend to undermine the prison administration's ability to maintain security within the prison.

But criminal activity is only one facet of the El Rukn's identity. They have another side, a religious one. Eugene Hunter,[6] whose Muslim name is Salim Abdul Khaadim-El, is an Emir of the organization. He has been a member of the Moorish Science Temple of America, El Rukn Tribe since its inception in 1976. He described the form of worship and symbolism of the El Rukns by demonstrating the stances assumed in prayer and recounting to their history and beliefs.

In 1976, Jeff Fort founded the El Rukn Tribe of the Moorish Science Temple of America. Fort had converted to Al Islam and become a Muslim while he was in prison from 1972 to 1976. Fort became the spiritual leader of the El Rukn Tribe as well as the director of its criminal activities. Fort wrote Malik's Lessons, the six requirements for a proper life that form the basis of instruction for membership in the El Rukn Tribe (Plaintiffs' Exhibit 2). Hunter says that the El Rukns have about 500 to 1,000 members and about twenty Emirs govern the organization. He says that Jeff Fort went inactive about one and a half years ago and is no longer a member. Other El Rukns also testified that Fort had left the organization and was no longer a member. El Rukn witnesses were very evasive in their responses about Fort's present connections with the El Rukns and what part Fort plays in governing the organization. I find the assertion that Fort no longer has any connections with the El Rukns incredible. The clear preponderance of the credible evidence is that Fort is still the leader and chief of the El Rukns even though Fort is in prison.

The El Rukns are adherents of Islam. They believe there is no God but Allah and that Mohammed is His prophet. They now hold that Noble Drew Ali, the founder of the Moorish Science Temple in America, was a holy man but not the last prophet. Until 1985, the El Rukns had revered Noble Drew Ali as a prophet. *El Rukn,* Hunter said, means cornerstone of the Kaaba, the stone of the Temple established by Abraham.

Hunter testified that The Glorious Koran (Plaintiffs' Exhibit 1) is the basic holy book of the El Rukns. The Glorious Koran together with the Holy Koran of the Moorish Science Mosque of America (Plaintiffs' Ex-

only in the past two to three years and play no part in the management of the organization.

**5.** The statements were admitted under Fed.R. Evid. 801(d)(2)(A). *See* Louisell & Mueller, Federal Evidence, § 423.

**6.** Hunter was convicted of murder in 1975 and possession of marijuana in 1983.

hibit 2) and the writings of Jeff Fort form the instructions and precepts of the El Rukn community.

The El Rukns hold religious services each week on Friday and on Sunday at their mosque at 3947 South Drexel Boulevard in Chicago. Jumah, the service on Friday, begins at noon and is attended only by males. Jumah is conducted by an Imam or, in the absence of an Imam, by the person considered most learned in Islamic theology. Mr. Hunter described the ceremony. After beginning prayers, the members sit in a circle and each person "demonstrates," reciting the teachings or tenets of the El Rukns' beliefs. The Imam may deliver a Kauba, which is like a sermon, and instruction may be given at any point in the service. *See* Plaintiffs' Exhibits 4 (Surahs from the Glorious Koran), 6 (Five Pillars of Islam) and 7 (the Al-Fatihah showing prayer sequence). The Sunday services are for women and children and have, as their primary focus, instruction and education.

El Rukns observe Ramadan which is a month-long period of study, prayer, and dietary restrictions to commemorate the revelation of The Glorious Koran to Muhammed. The observation of Ramadan requires a Muslim to take meals before sunrise and after sunset. The conclusion of the month of Ramadan is celebrated with a feast called Il Fitr.

Some items of clothing and ornamentation are symbols in El Rukn religious exercise. The El Rukn medallion (Plaintiffs' Exhibit 8A) is similar to a general Muslim medallion (Plaintiffs' Exhibit 8B), except the El Rukn medallion has the organization's name printed on it. El Rukns wear a kufi (Plaintiffs' Exhibit 9(b)) as a sign of their religion and on Friday may wear a fez (Plaintiffs' Exhibit 10) to display Moorish identity. El Rukns also carry a nationality card (Plaintiffs' Exhibit 11) to show they are descendants of Moroccans and the Moabites.

The testimony clearly shows that the Department of Corrections refuses to grant official recognition to the existence of the El Rukns and will not permit the El Rukns to wear or to possess those materials that

identify them as El Rukns. Anything that says "El Rukn" or symbolizes El Rukn is contraband and is confiscated from inmates by the Department.

Robert W. Horn, who currently is the Chaplain at Graham Correctional Center, was Administrator of Chaplain Services for the Department in 1974. His job included training chaplains and screening applications by religious organizations to hold religious services in the prisons. He handled the El Rukn's application for recognition in 1977. The El Rukns applied first at Stateville. Mr. Horn met with the institution administrators, the chaplain, and inmates. Horn tried to meet with members in the free community but when he wrote to the El Rukn Temple he received no response to his letters and could not reach anyone on the telephone. The telephone number given by the applicants was the number of a phone in a boxing gymnasium. The El Rukns never supplied a program statement as was required by Department regulations in effect at that time.

The El Rukns were never recognized by the Department. No program was accepted, nor was an outside clergyman approved to come into any institution to hold services. Mr. Horn says his superiors, presumably the directors of the Department, decided El Rukn was not a legitimate religion. Mr. Horn's memoranda about the El Rukns make clear that they were excluded from Ramadan and their organization symbols and writings were contraband. *See* Plaintiffs' Exhibits 16(b), 39, 40.

From the testimony of other Department chaplains, it is apparent that inmates in Illinois prisons are able to attend Christian, Jewish, or Islamic services. Muslims may participate in the observance of Ramadan if they have regularly attended Jumah services on Friday. The Islamic services that are sanctioned by the Department are those of the American Muslim Mission (now dissolved and decentralized) and the Moorish Temple of America, Baltimore Branch.

Imam Khalilalah, senior chaplain at the Pontiac Correctional Center, says that he has issued Islamic service cards to El Rukns allowing them to attend the Ameri-

can Muslim Mission's Jumah services. Khalilalah also says he was acquainted with Eugene Hunter and Reico Cranshaw when they were inmates at Pontiac. Imam Khalilalah says he didn't bar Hunter from attending Ramadan but did insist that Hunter prostrate himself during prayer as Muslims are required to do. El Rukns, Hunter says, do not prostrate themselves when they pray.

Imam Agin Muhammad, Sr., the Islamic chaplain at Stateville, who, like Khalilalah, is associated with the American Muslim Mission (now dissolved and decentralized), says anyone may attend Islamic services. In fact, Imam Muhammad says, there is a Moorish Science Temple of America service at Stateville each Friday. That service is distinct and separate from the service of the American Muslim Mission and is conducted by an inmate. Anyone may attend the service as an individual, Imam Muhammad says, but not as an identified group. As of the date of this writing, it appears that the Department bars no individual from attending religious services and that anyone professing Al Islam may participate in Ramadan. It is true, as plaintiffs point out, that gang members attend religious services but they attend as individuals and not as a sanctioned or officially recognized groups. The significant fact is that El Rukns, qua El Rukns, were not allowed to hold their own services or to possess materials identifying them as El Rukns.

The defendant presented the testimony of Dr. John Gordon Melton, Director of the Institute for the Study of Religion. He is the editor of The Encyclopedia of American Religions, the recognized listing of American religious groups. Dr. Melton is of the opinion that the El Rukns are not an established religion, but only because they haven't existed for a sufficient length of time. They have all the indicia of a religion: belief in a deity, a holy book, a place of worship, and a form of worship. The El Rukns are obviously in a state of development and are moving, Dr. Melton believes, closer and closer to main-line Islamic teaching and practice.

*Legal Conclusions*

The parties have devoted significant portions of their presentations, through both evidence and argument, to the question whether the El Rukns are a genuine religious organization. The defendant argues that the El Rukns are shams who use religion as a cover to obtain First Amendment protection for their real business, which is criminal activity. Certainly the El Rukns profess beliefs that are consonant with the basic tenets of Islam. They are monotheists. They believe in one God, Allah, and that Muhammed Abdullah is His prophet. They study and revere the Glorious Koran which is their principal holy book and scripture. They have established ceremonies and have a regular time and place of worship. "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." *United States v. Seeger,* 380 U.S. 163, 175, 85 S.Ct. 850, 858, 13 L.Ed.2d 733 (1964); quoting Chief Justice Hughes in *United States v. Macintosh,* 283 U.S. 605, at 633–34, 51 S.Ct. 570, at 578, 75 L.Ed. 1302 (1931). The El Rukns' professed beliefs undeniably meet that test.

It is true that the El Rukns are still in a state of development of their beliefs and practices and the members who testified showed a certain lack of uniformity in their understandings. The defendant's argument that the El Rukns' beliefs are not religious because their beliefs are changing, however, is without merit. "Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas v. Review Board, Ind. Empl. Sec. Div.,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981).

The difficult question about the El Rukns is whether their beliefs are sincerely held, for even if "[t]he 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.'" *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733

(1964). The defendant urges the conclusion upon the court that the El Rukns are insincere. The evidence concerning the criminal activities of the El Rukn *organization* is not completely persuasive of a lack of religious sincerity on the part of the *individuals* who testified. There is a gulf, however, that divides what the individuals profess and what the El Rukn organization does. Perhaps the El Rukns have created a division of labor within the organization, and the witnesses who came to testify are people whose primary duties are spiritual in nature while other members devote themselves to the more temporal pursuits of the group. The court need not to decide whether the plaintiffs truly hold the beliefs they claim, however, because the court concludes that the decision in this case rests on the discussion which follows.

■ The right to hold a particular religious belief is absolute, but the right to freely exercise a religious belief is not. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Although prisoners do not lose their First Amendment rights upon incarceration, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), those rights are subject to restriction when the limitations placed upon the rights further a legitimate governmental purpose. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.* at 822, 94 S.Ct. at 2804.

■ The restrictions which the defendant places upon incarcerated El Rukns obviously infringe the First Amendment rights of association and the free exercise of religion which the plaintiffs would enjoy as El Rukns on the street. However, "[t]he operational realities of a prison dictate restrictions on the associational rights among inmates." *Jones v. North Carolina Prisoners Association*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). The court must carefully scrutinize these restrictions on the plaintiffs' First Amendment rights and decide if the governmental policies are necessary to carry out the legitimate goals of the correctional system. *Childs v. Duckworth*, 705 F.2d 915, 920 (7th Cir.1983).

Put another way, "prison rules that incidently restrain the free exercise of religion are justified only 'if the state regulation has an important objective and the restraint on religious liberty is reasonably adapted to achieving that objective.'" *Madyun v. Franzen*, 704 F.2d 954, 960 (7th Cir.1983); quoting *LaReau v. McDougall*, 473 F.2d 974, 979 (2nd Cir.1979), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). *Cf. Shabazz v. O'Lone*, 782 F.2d 416 (3rd Cir.1986) (state must show that challenged regulations are intended to serve and do serve the penological goal of security); *Walker v. Blackweel*, 411 F.2d 23 (5th Cir.1969) (state must show a compelling interest for restriction on First Amendment rights).

■ The evidence clearly shows that the defendant is justified in restricting the association of the El Rukns and in refusing to permit them to identify themselves in the prison setting as El Rukns. The security problem caused by street gangs in Illinois prisons is well documented. *See Godinez v. Lane*, No. 83–2057 (C.D.Ill. July 28, 1983), *rev'd on other grounds* 733 F.2d 1250 (7th Cir.1984). The testimony of Warden Fairman and Assistant Deputy Director DeRobertis highlights both the specific occasions on which El Rukns have threatened institutional security by smuggling weapons into a prison and the general security problems that would be created by recognition and grants of special associational rights to El Rukns. Credible evidence in the record also supports the contention that El Rukns continue their criminal activity while they are incarcerated.

The court cannot gainsay the decision of the prison administrators on this sensitive question of institutional security. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The plaintiffs want to hold separate, El Rukn religious services and wear and possess El Rukn emblems. The court finds that the restrictions placed upon these activities by the defendants, necessitated by legitimate security concerns, do not violate the First Amendment.

█ Finally, the plaintiffs contend that the defendant's conduct works a denial of equal protection. The court rejects that contention. The policy which denies El Rukns the right to wear or possess emblems identifying them as El Rukns is the same policy that prevents other gangs from wearing identifying emblems. The policy which denies El Rukns the right to possess written material identifying them as El Rukns is the same policy that applies to other gangs. An El Rukn can possess a Koran, but not one titled "El Rukn." An El Rukn can possess a prayer rug or an Islamic medallion, but not one that says "El Rukn." An El Rukn can go to Islamic services or to Ramadan observance, but not as an El Rukn. "While every religious sect or group need not be provided with identical facilities for worship, a prisoner must be afforded 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.' " *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir.1983), quoting *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Individual El Rukns are afforded that reasonable opportunity to pursue their belief in Al Islam, but not as El Rukns, for the evidence shows that the El Rukns are a street gang and a threat to institutional security.

For the foregoing reasons, the equitable and declarative relief sought by the plaintiffs is denied and the complaint is dismissed.[7] The Clerk is directed to enter judgment in favor of the defendant and against the plaintiffs. Each party shall bear its own costs.

---

**7.** In their reply trial brief, the plaintiffs raised, for the first time, a request that the plaintiffs be permitted to submit to the Department of Corrections for approval a plan or program outlining proposed religious services for the El Rukns. The new proposal would eliminate any reference to *El Rukn* and permit the plaintiffs to have the "contents" of their beliefs without recognition of the name *El Rukn.* This is a departure from the relief sought up to this time. Moreover, the court would observe that the plaintiffs may submit any petition they choose to the Department. Their original petition was deficient. It never had an approved sponsor.