Ronnie JOHNSON–BEY, John Lee Lips-
comb–Bey, and Reginald Morgan–Bey,
Plaintiffs–Appellants, Cross–Appellees,

v.

Michael P. LANE, et al.,
Defendants–Appellees,
Cross–Appellants.

Nos. 86–2205, 86–2581 and 86–3052.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1988.
Decided Dec. 5, 1988.

Patrick O'Hara, Blane & O'Hara, Peters-
burg, Ill., for plaintiffs-appellants, cross-ap-
pellees.

William D. Frazier, Office of Illinois
Atty. Gen., Chicago, Ill., for defendants-ap-
pellees, cross-appellants.

Before POSNER, RIPPLE and
KANNE, Circuit Judges.

POSNER, Circuit Judge.

The appeal and cross-appeal in this pris-
oners' civil rights case under 42 U.S.C.

§ 1983 present issues of religious freedom. The plaintiffs, three inmates at the Illinois state prison at Menard, belong to the black Islamic sect known as the Moorish Science Temple of America. That it is a bona fide religion is not questioned, although three-fourths of its temples (congregations) are inside prisons. The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder (in 1913) of the Moorish Science Temple, Prophet Noble Drew Ali. The Moorish religious observances include the wearing of the fez. Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by Grand Sheik/Moderator Brother R. Love–El, and one in St. Louis headed by Grand Sheik Jerry Lewis–Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.) The plaintiffs now concede that only the Mt. Clemens group is legitimate. The sinister El Rukn group is a breakaway faction from the Moorish Science Temple, see *Faheem–El v. Lane*, 657 F.Supp. 638, 642 (C.D.Ill.1986); apparently it no longer has any connection with the Moorish Science Temple.

Menard prison has two full-time chaplains on its payroll, one Protestant and the other Catholic. We were told at argument that since the trial in this case the prison has added a part-time Islamic chaplain, but he is not a Moor. Prisoners of other faiths (the occasional Jew or Buddhist) are served by clergy of their faith who visit the prison. Since 1979, the Moors at Menard have been trying without success to arrange for religious services in the Moorish faith. At first their efforts focused on persuading the prison to allow ministers from the St. Louis group to conduct services at the prison, but the prison officials vetoed this on the ground that the St. Louis clergy include convicted criminals and are dangerous. Later the Moors invoked paragraph II F of Administrative Regulation 839 of the state's Department of Corrections: "Where religious groups are without the services of a clergyman, they may submit a request to the chaplain for approval of resident-conducted religious activities under the supervision of a staff member." The Moors submitted a request, but it was turned down on security grounds. However, the prison's chaplains looked for Moorish ministers among the Mt. Clemens group, and in 1986 identified two suitable candidates for conducting Moorish services at Menard on a visiting basis. The two ministers were already conducting services on a visiting basis at the federal prison at Marion, Illinois, and they agreed to visit Menard as well, asking only for a small amount of money to defray their expenses. However, it is the prison's unwritten policy to require from any religious organization proposing to supply clergy a statement specifying the time, place and nature of the services to be conducted and identifying the clergy who will conduct them—and no such statement was submitted here. The requirement of a "free-world sponsor," upheld in *Tisdale v. Dobbs*, 807 F.2d 734, 738 (8th Cir.1986), is not questioned by these plaintiffs. Nor do they question the prison's right to insist that the "free-world sponsor" submit a statement describing the proposed program of religious activities in the prison, a requirement upheld in *Childs v. Duckworth*, 705 F.2d 915, 921 (7th Cir.1983).

This suit was originally filed in 1981, named as defendants the relevant prison officials, and came on for a bench trial before a federal magistrate in 1986 pursuant to an agreement by the parties that the magistrate could conduct the trial and enter a final judgment appealable to this court. See 28 U.S.C. § 636(c). After the trial, the magistrate issued a declaratory judgment. Believing that the security concerns that had been the ostensible reason for turning down the Moors' request for permission to conduct their own services were spurious, he ruled that the Moors had to be allowed to conduct their own services, although only until the defendants arranged for the two ministers from the Mt. Clemens group to provide "contractual religious services for the members of the Moorish Science Temple of America at Menard." If necessary, the defendants were

to pay the ministers "in accordance with an hourly rate comparable to that paid to the chaplains of the Catholic and Protestant faiths." But because the plaintiffs had not filed a proper program statement, the magistrate rejected their claim for damages. Both sides appeal.

We have found it difficult to obtain a clear idea from the record, the magistrate's opinion, and the briefs and argument of the parties of what the dispute in this lawsuit is about. The case was not tried well by either side, the magistrate's opinion is confusing and incomplete, the appeal briefs are unclear, and, most important, relevant circumstances have changed greatly in the inexplicably long interval between the filing of the original complaint and the argument of the appeals. The defendants question neither the legitimacy of the Mt. Clemens branch of the Moorish Science Temple hierarchy nor the propriety of having ministers from that branch visit Menard to conduct services for the 30 or so Moorish inmates, while the plaintiffs question neither the requirement for filing a program statement describing the desired religious activities nor the prison's right to veto on security grounds any minister they propose, and they also do not insist that the prison employ a full-time or even a part-time Moorish chaplain. Moreover, it seems the plaintiffs desire religious services conducted by inmates only as a second-best alternative to services conducted by the ministers from the Mt. Clemens branch. Although there are potential issues concerning the frequency of these visits and whether the prison will defray any of the expenses incurred by the Moorish Science Temple in connection with them, those issues are not ripe for decision. The magistrate did not discuss them, except for his gratuitous reference to paying the Moorish ministers an hourly wage comparable to that of the prison's chaplains—gratuitous because no one had requested that the Moorish ministers be paid for their time, as distinct from being reimbursed for their expenses, and because there is no evidence on these issues except the ministers' request for reimbursement of expenses.

If we had the unlimited equitable discretion possessed by the Lord Chancellor of England in early medieval times, we would suspend the lawsuit and ask the parties to report back to us in six months concerning their progress in working out mutually acceptable arrangements to secure the Moorish inmates' religious rights without compromising the prison's security. There seems little doubt that such arrangements are feasible and indeed they may already be well in train. As we do not have so capacious a discretion, we shall plod through the appeals.

■ Rejecting the old "hands off" approach to problems of prison administration, the courts of late have held that prison inmates retain a number of constitutional rights, including the right to the free exercise of their religion—but in distinctly truncated form: the prison is entitled to curtail these rights to the extent necessary to protect security. See, e.g., *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir.1988); *Mumin v. Phelps*, 857 F.2d 1055 (5th Cir.1988); *Standing Deer v. Carlson*, 831 F.2d 1525, 1528–29 (9th Cir.1987); *Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir.1987). The "free" exercise of religion thus is rather a misnomer in the prison setting. No one thinks that a prison is required to excuse inmates to attend religious services outside of the prison. It need not yield to their desire to invite convicted felons, frocked or unfrocked, to conduct religious services in the prison. It need not employ chaplains representing every faith with at least one adherent among the prison population. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (per curiam); *Allen v. Toombs, supra*, 827 F.2d at 568–69; cf. *Kahey v. Jones*, 836 F.2d 948 (5th Cir.1988). It need not—as we held in *Hadi v. Horn*, 830 F.2d 779 (7th Cir.1987)—allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners. To the same effect see *Cooper v.*

*Tard,* 855 F.2d 125 (3d Cir.1988); cf. *Tisdale v. Dobbs, supra,* 807 F.2d at 738.

■■■■ On the other hand the prison may not, because it is contemptuous or unreasoningly fearful of a particular sect, place arbitrary obstacles in the way of inmates seeking to participate in the sect's modes of observance. *Cruz v. Beto, supra,* 405 U.S. at 322, 92 S.Ct. at 1081–1082; cf. *SapaNajin v. Gunter,* 857 F.2d 463 (8th Cir.1988). Apparently the magistrate thought Menard had done this. Yet there is little evidence to support his conclusion. The prison was acting within its authority in refusing to allow the Moorish inmates to conduct their own religious services. The magistrate pooh-poohed the security concerns to which the defendants testified at trial, pointing out that Moorish inmates have on occasion been allowed to conduct their own services in other prisons, including the Illinois state prison at Stateville. See *Faheem–El v. Lane, supra,* 657 F.Supp. at 644. The Supreme Court has made clear, however, most recently in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), also a case involving a claim by prisoners to be allowed to attend group religious services, that "regulations alleged to infringe constitutional rights" are valid if "reasonably related to legitimate penological objectives." *Id.* 107 S.Ct. at 2407. They need not be imperatively related to compelling needs. It is uncontested that Menard had a policy, albeit unwritten and in tension with the above-quoted Administrative Regulation 839, of forbidding inmates to conduct religious services. Menard is a high-security prison; it has serious security problems. The reasonableness of a regulation banning lay inmates from assuming positions of religious authority in Menard cannot reasonably be doubted—especially when, as mentioned earlier, the inmates in this case don't want to conduct religious services themselves unless clergy are unavailable to do so.

■■■■ The key issue therefore is whether the defendants delayed unreasonably in making arrangements for Moorish ministers to visit Menard. In *Hadi v. Horn,* where we upheld a policy against inmate-conducted Muslim services at another Illinois state prison, we pointed out that the prison had a full-time Muslim chaplain. See 830 F.2d at 786. As this example suggests, the reasonableness of the ban on inmates' conducting their own religious services is related to the availability of substitutes, whether chaplains employed by the prison or ministers invited on a visiting basis. If Menard was willing to invite ministers to conduct Moorish services—if it wasn't just stalling when it required a program statement—the invocation of the unwritten policy against inmate-conducted services was not only reasonable but harmless, since the program statement could have been prepared, submitted, and approved in short order. The magistrate seemed not to think that the prison had unreasonably delayed; this was the ground for his refusal to award damages. He seems to have recognized that the delay had resulted from the failure of the Moorish prisoners to ask the Mt. Clemens group to submit a program statement. Hence we do not understand the grant of declaratory relief, which essentially requires the prison to sign contracts with the Moorish ministers not only authorizing them to visit but also compensating them for their time at a rate comparable to that paid the two Christian chaplains. The relief is distinctly premature—no violation of the plaintiffs' rights having been shown—and in entering into the mechanics of compensation strays beyond the issues framed by the parties.

The magistrate failed to confront the most significant evidence in favor of the defendants. For much of the time that this suit was pending, the plaintiffs wanted to invite a felon from the St. Louis branch, which they now acknowledge is not part of the legitimate hierarchy of the Moorish Science Temple. The flirtation with St. Louis was a major delaying factor and one that cannot be laid at the door of the prison. In fact it was the prison chaplains who located ministers belonging to the Mt. Clemens branch. The flirtation with St. Louis also gave the prison a compelling argument for enforcing its requirement that a program statement be filed naming the ministers and specifying the frequency and duration

of the services they would conduct—not that a *compelling* argument grounded in specific circumstances would be necessary to justify so moderate and sensible a requirement. The plaintiffs did not take the steps necessary to satisfy the requirement. Cf. *Garza v. Miller,* 688 F.2d 480, 486–87 (7th Cir.1982). They could have, as we have said, simply written the ministers whom the chaplains had located and asked them to submit such a statement; they did not do this. In these circumstances the magistrate had no basis for concluding that the prison had violated the plaintiffs' religious rights.

Or so at least it appears. If it were clear we would reverse with directions to dismiss the suit, but it is not clear. There is evidence that the ban against inmate-conducted services is enforced arbitrarily in the Illinois prison system. See *Faheem–El v. Lane, supra.* It is unwritten, and is in conflict with a written regulation that appears to authorize such services; such a conflict invites arbitrary and discriminatory application. The written regulation was rescinded in 1984, see *Hadi v. Horn, supra,* 830 F.2d at 785 n. 8, but its rescission would not affect the plaintiffs' claim for damages during the period when it was in force. (Recall that this suit started in 1981.) There is evidence that one of the plaintiffs was never advised of the need for a program statement, even after he had advised the prison authorities repeatedly and in writing of his desire to attend Moorish religious services; the magistrate did not comment on this evidence. That Christian chaplains are in charge of seeking and evaluating ministers of non-Christian faiths is not troubling in itself; this is the practice in the military as well, and, so far as we know, it works well there. But there is no evidence as to how it works in the Illinois prison system. The potential financial burden on small sects of providing visiting ministers to prison—the prison authorities deem them "volunteers" and will not compensate them even to the extent of reimbursing them for their expenses, while picking up the full tab for full-time chaplains for Catholic and Protestant prisoners —is troubling. Furthermore, votaries of

other non-Christian sects at Menard, notably the orthodox black Muslims, seem to get better treatment than the Moors. True, there are more of the orthodox Muslims (111, versus the 30 Moors), but there appear to be far fewer Jews than Moors, and the Jews, we were told at argument, are ministered to by visiting rabbis.

A state can, of course, get into trouble under the establishment clause of the First Amendment when it hires or funds clerics. But the defendants do not invoke the establishment clause—and could hardly do so, since the prison employs chaplains. So do the armed forces, and the constitutionality of the Army chaplaincy program has been upheld. See *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985). A challenge to a public hospital's employment of a chaplain was recently rebuffed. See *Carter v. Broadlawns Medical Center,* 857 F.2d 448 (8th Cir.1988). To similar effect see our dictum in *Baz v. Walters,* 782 F.2d 701, 709 (7th Cir.1986). Patients in public hospitals, members of the armed forces in some circumstances (e.g., the crew of a ballistic missile submarine on duty)—and prisoners —have restricted or even no access to religious services unless government takes an active role in supplying those services. That role is not an interference with, but a precondition of, the free (or relatively free) exercise of religion by members of these groups. The religious establishments that result are minor and seem consistent with, and indeed required by, the overall purpose of the First Amendment's religion clauses, which is to promote religious liberty. Prisons are entitled to employ chaplains and need not employ chaplains of each and every faith to which prisoners might happen to subscribe, but may not discriminate against minority faiths except to the extent required by the exigencies of prison administration.

█ It is possible that the defendants gave the plaintiffs the run-around and it is a possibility that must be taken seriously. The treatment of prison inmates and the treatment of religious heterodoxy are important indices of civilization, and both are involved here. This case is not so thread-

bare that we could be confident that justice had been done if we ordered the action dismissed. We therefore remand for further proceedings consistent with this opinion, and pursuant to Circuit Rule 36 we direct that those proceedings be before another judicial officer, who may if he sees fit take additional evidence. We would encourage him to do so.

Rule 36 does not mention magistrates, but its reference to "judge" must be assumed to encompass magistrates when they exercise the powers of federal district judges, as they do under 28 U.S.C. § 636(c). Whether the parties' original consent to trial and entry of judgment by a magistrate is binding on remand, and if so whether the district judge can properly use his power under section 636(c)(6) to withdraw the reference to the magistrate and direct that further proceedings be conducted before a district judge, are matters we leave to the district judge to decide in the first instance, since they have not been briefed in this court.

No costs will be awarded in this court.

REVERSED AND REMANDED, WITH INSTRUCTIONS.