John Wesley YOUNG III, et
al., Plaintiffs,

v.

Michael P. LANE, Director, Department
of Corrections, State of Illinois, et
al., Defendants.

Nos. 85 C 20019, 85 C 20020, 85 C
20022 to 85 C 20024 and 86
C 20398.

United States District Court,
N.D. Illinois, W.D.

March 26, 1990.

Mary Gorman and Karl Winkler, Rockford, Ill., for plaintiffs.

William Frazier, Asst. Atty. Gen., Chicago, Ill., for defendants.

## ORDER

ROSZKOWSKI, District Judge.

### BACKGROUND

Several plaintiffs filed complaints in the United States District Court for the Northern District of Illinois alleging deprivations of their constitutional rights in regard to religious freedom. Suit was brought under

42 U.S.C. § 1983 seeking injunctive/declaratory relief and damages. Jurisdiction of this court is based upon 28 U.S.C. § 1343. The complaints were consolidated for trial. Defendants moved for summary judgment on May 2, 1988. This motion was taken with the proofs at trial. Trial was held on May 12, 13 and 19, 1988. The following findings of fact and conclusions of law are a result of that trial.

## FINDINGS OF FACT

Plaintiffs consist of a group of prisoners incarcerated at the Dixon Correctional Center in Dixon, Illinois. Dixon Correctional Center is a part of the Department of Corrections of the State of Illinois and is a medium security prison. Defendants consist of Mr. Michael P. Lane, Director of the Department of Corrections of the State of Illinois; Mr. Leo L. Meyers, Assistant Director of the Adult Division of the Department of Corrections; Mr. Richard B. Gramley,[1] Warden at Dixon Correctional Center; Mr. Larry E. Sachs, Assistant Warden for Programs at Dixon Correctional Center; and Mr. William D. O'Sullivan,[2] Assistant Warden of Operations at Dixon Correctional Center.

Plaintiffs are Jewish inmates who desire to practice their religion during their period of incarceration at Dixon Correctional Center. Approximately 20,000 persons are incarcerated within the Illinois Department of Corrections statewide. Of these persons, approximately 110 are of the Jewish faith. At the time of trial, Dixon Correctional Center housed 890 inmates. Seven of these were Jewish.

Several requirements exist in relation to the practice of Judaism. The necessary garments include: a tzitzes, which is a fringed garment that is worn all day and may be worn underneath a shirt so that only the fringes are visible; a yarmulke, which is a skull cap that is also worn at all times; a tephillin, which is best described as an arm "wrap" that is worn during morning prayers; and a talus, which is a prayer shawl that is also worn during morning prayers. Daily prayer, for the Jew, occurs three times a day: once in the morning, once in the afternoon and then once again after sundown. During prayer, prayer books are used. The Jewish Bible is used for study as are the Torah and the Talmud containing language, philosophy and Jewish law.

Numerous Jewish holidays exist throughout the year. On these holidays, Jewish law requires the Jew to do no work. The holidays (and the dates on which they occurred in 1988) are: Pesach or Passover (April 2–9);[3] Shavuot (May 21 and 22); Rosh Hashana (September 12 and 13); Yom Kippur (September 21); Succot (September 26–October 2);[4] and Simhat Torrah (October 3 and 4). Three "post–Biblical" holidays are also observed: Purim (one month before Passover); Hanukkah (December 4); and Tisha B'av.[5] Finally, Jews are not allowed by Jewish law to work on their Sabbath.

Religious articles are used on the various Jewish holidays. A ram's horn is used on Rosh Hashana. Special holiday prayer books are required. Candles are used on holidays and on every Sabbath, staying lit until the Sabbath is over. The Sabbath also requires a cup of wine or grape juice and challus rolls. Passover calls for a "festive" meal and unleavened bread.

---

1. Plaintiffs' original complaint named Ms. Linda A. Giesen as a defendant in the lawsuit. Ms. Giesen was the warden at Dixon Correctional Center when the case was filed. Mr. Gramley is the present warden at Dixon Correctional Center. The court substituted Mr. Gramley for Ms. Giesen for purposes of official acts of the Warden at Dixon Correctional Center and for purposes of appropriate relief by order of May 12, 1988.

2. Mr. O'Sullivan was named as a defendant only in Plaintiff John Phillips' complaint. However, since the prisoners' complaints were consolidated for trial, Mr. O'Sullivan remains a defendant for purposes of this order.

3. Jewish law requires a Jew not to work on the first two days and last two days of Passover.

4. Jewish law requires a Jew not to work for two days during Succot.

5. No evidence was submitted to the court as to the date Tisha B'av was observed in 1988.

A Jew also has special dietary requirements. Persons of the Jewish faith may eat anything that grows out of the earth. They may also eat fish having scales and fins. Jews may not, however, eat meat from an animal with a cloven hoof or an animal that chews its cud. Dairy products and meat may not be eaten at the same meal. All food must be prepared using kosher implements and a kosher stove. The food must also be served in a kosher manner. This means that the kosher food must not be exposed to non-kosher items.

The Illinois Department of Corrections has not published any specific statewide policies instructing the various Illinois Correctional Centers on how to deal with Jewish inmates who desire to practice their religion. As such, Dixon Correctional Center officials have been inconsistent and slow in responding to Jewish inmates' requests for diet, garments, articles and services in line with their Jewish faith. Prior to June 1987, Jewish inmates at Dixon Correctional Center were permitted to wear yarmulkes all day long. At present, however, inmates are allowed to wear yarmulkes only in their cells and during religious services.

Dixon Correctional Center does provide prayer books for inmates' use. The books are kept in the chaplain's office, not in the Jewish prisoner's cell. As such, an inmate must ask the chaplain or a guard to obtain a prayer book for him every time the inmate desires to pray.

No rules exist regarding the provision of religious services to Jewish inmates. A general rule, promulgated by the Illinois Department of Corrections, does require a Correctional Center to provide religious services. Dixon Correctional Center is serviced by volunteer rabbis who provide religious services for Jewish inmates on some holidays and on some Sabbaths. Over a three and one-half year period, volunteer rabbis visited Dixon Correctional Center approximately forty-three times. When a rabbi is not present, Dixon Correctional Center allows inmates to gather for prayer and/or services only when a staff supervisor is present.

Beginning in December of 1985, a kosher diet was available at Dixon Correctional Center. Some breaks in the availability of kosher meals did occur during this time due to depletion of supplies and delays in receiving new deliveries of kosher meals. Special Passover meals also were served to Jewish inmates.

## CONCLUSIONS OF LAW

Imprisonment deprives prisoners of many rights. Courts do recognize, however, that prison inmates retain limited constitutional rights including the First Amendment's guarantee of free exercise of religion. The right is limited in that a prisoner's religious exercises may be regulated by prison authorities. The regulation, in turn, is valid as long as it is "reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). Prison officials may not arbitrarily place obstacles in the way of inmates who seek to participate in their religion's tenets. *Johnson–Bey v. Lane*, 863 F.2d 1308, 1311 (7th Cir.1988). Accordingly, a prisoner's right to exercise his religion under the First Amendment must be balanced against the legitimate goals of the penal institute. *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir. 1987).

The Supreme Court has set forth factors to be used in applying the reasonableness standard when reviewing prisoners' constitutional claims. The factors are:

1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;

2. whether there are alternative means of exercising the right in question that remain available to prisoners;

3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and

4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy

alternatives may be evidence that the regulation is not reasonable. *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

■ Defendants argue that Plaintiffs in this case are insincere in their quest for religious freedom. Rather, Plaintiffs are bringing suit merely to gain financially in regard to damages. Defendants cite instances where some Plaintiffs were seen eating non-kosher food when kosher food was available. The Seventh Circuit has recognized, however, that a person need not steadfastly adhere to every tenet of his religious faith in order to be found to be sincere in his beliefs. In *Reed v. Faulkner*, 842 F.2d 960 (1988), the Seventh Circuit found that some religions place unrealistic demands on their adherents. The court held that "it would be bizarre for prisons to undertake in effect to promote strict orthodoxy, by forfeiting the religious rights of any inmate observed backsliding, thus placing guards and fellow inmates in the role of religious police." 842 F.2d at 963. The fact that some Plaintiffs, in this case, were observed eating non-kosher food is not conclusive evidence of insincerity. The court finds, rather, Plaintiffs' beliefs and Plaintiffs' desires to exercise their beliefs are sincerely held. The key issue, therefore, is whether Defendants unreasonably restrained Plaintiffs in practicing Judaism.

■ Plaintiffs desire to wear their yarmulkes all day, both inside and outside their cell. Defendants, however, only allow yarmulkes to be worn inside the cell and during religious services. Defendants state that this policy is rationally related to security concerns in preventing contraband from being hidden under the yarmulkes and in preventing gang warfare. Defendants argue that because yarmulkes are available in different colors, Plaintiffs may use the skull caps to show their affiliation to various gangs.

Applying the Supreme Court's factors to the wearing of yarmulkes, the court concludes that Defendants' policy does deprive Plaintiffs of their free exercise rights. The court does not see where a valid, rational connection exists between the policy regarding yarmulkes and the prison's interest. The Illinois Department of Corrections permits inmates to wear baseball caps at anytime. Unlike baseball caps, yarmulkes fit very tightly on one's head making it much more difficult, than in the case of baseball caps, to hide contraband. Moreover, Defendants' Exhibit 1 shows that the allowed baseball caps are available in seven colors, thereby making the distinction from yarmulkes in terms of gang warfare non-existent. Prior to 1987, Plaintiffs had been allowed to wear their yarmulkes all day. Defendants submitted no evidence that security was impaired during that time. The regulation in regard to the wearing of yarmulkes is, therefore, not reasonably related to legitimate penological interests.

Plaintiffs also claim that Dixon Correctional Center's failure to reimburse visiting rabbis for travel expenses prior to 1986 violates their constitutional rights. Plaintiffs point out that other religious leaders (e.g., Catholic priests) were reimbursed for such expenses. The fact that Jewish rabbis were not reimbursed resulted in fewer opportunities available for inmates to be counseled regarding religious matters.

■ A prison is not required to employ chaplains representing every faith with at least one adherent among the prison population. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972); *Johnson–Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir.1988). However, as recognized by the Seventh Circuit in *Johnson–Bey v. Lane*, the fact that prison authorities hire and compensate full-time chaplains for Catholic and Protestant prisoners and do not hire or sufficiently compensate full-time chaplains for Jewish inmates is "troubling." *Id.* This court recognizes, as did the Seventh Circuit in *Johnson–Bey*, that a State can get into trouble in relation to the establishment clause under the First Amendment when it hires or funds chaplains. However, Defendants do not argue that funding Jewish rabbis would violate the establishment clause. The armed forces similarly funds religious chaplains

and such a funding has been constitutionally upheld. *See, e.g., Katcoff v. Marsh,* 755 F.2d 223 (2nd Cir.1985).

Paying the traveling expenses of a Jewish rabbi is more of a precondition to the free exercise of religion than the establishment of a religion. As the Seventh Circuit stated in *Johnson–Bey:*

> The religious establishments that result are minor and seem consistent with, and indeed required by, the overall purpose of the First Amendment's religious clauses, which is to promote religious liberty. Prisons are entitled to employ chaplains and need not employ chaplains of each and every faith to which prisoners might happen to subscribe, but may not discriminate against minority faiths except to the extent required by the exigencies of prison administration.

863 F.2d 1308, 1312 (7th Cir.1988). The court holds, therefore, that Defendants' failure to reimburse Jewish rabbis for traveling expenses at the time this case was filed, also violated Plaintiffs' First Amendment rights. No legitimate government interest for this failure can be found by the court upon applying the *Turner* factors.

■ Plaintiffs also contend that their First Amendment rights were violated because Defendants refused to allow Plaintiffs to hold inmate-led religious services in the absence of a rabbi. The Seventh Circuit has held that the policy of no inmate-led services is a legitimate security concern that is applied to all religious groups. Security is threatened in these instances due to the conflicts that may occur when inmates lack the requisite religious experience to resolve issues that arise during religious meetings. Security may also be threatened due to the danger that religious services may be used for gang meetings in order to disseminate information that may interfere with prison goals. *Hadi v. Horn,* 830 F.2d 779, 784 (7th Cir.1987). The Seventh Circuit has also recognized, however, that the reasonableness of the no inmate-led services policy is related to the availability of chaplains to conduct the services. *Johnson–Bey v. Lane,* 863 F.2d 1308, 1311 (7th Cir.1988).

This court believes that the policy of no inmate-led services is a legitimate regulation not infringing on Plaintiffs' First Amendment rights. Under the fourth *Turner* factor, however, the court believes a satisfactory alternative would be to allow inmates to gather for prayer and worship without a rabbi present when a staff supervisor is present to prevent any adverse effects. Apparently this is currently allowed at Dixon Correctional Center. This alternative would seem, to the court, to be less restrictive on a prisoner's religious exercise rights.

Finally, Plaintiffs' religious beliefs require a kosher diet. Dixon Correctional Center has accommodated these beliefs by providing kosher food to Jewish inmates since December of 1985. Accordingly, Plaintiffs' First Amendment rights have been observed by Defendants in this regard.

■ The next issue before the court, then, is the relief to be granted Plaintiffs for the deprivations of their constitutional rights. The relief granted coincides with the capacity in which Defendants are sued. Plaintiffs have brought this action against Defendants in their individual and official capacities. In an individual capacity action, personal liability is sought to be imposed on the defendant official. Any recovery to the plaintiff must be satisfied by the defendant official out of his personal assets. Relevant personal immunity defenses, such as the defendant reasonably relied on existing law, may be raised by the official. The official, in other words, may have qualified immunity from suit. *Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985); *Hadi v. Horn,* 830 F.2d 779, 782 (7th Cir.1987).

■ The Supreme Court has established an objective test to be used in determining whether an official should be allowed to claim the defense of qualified immunity. The test shields officials performing discretionary functions from liability if they did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Defendants have the burden of

proof in regard to claiming the qualified immunity defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ Defendants argue that they are immune from liability in their individual capacities because prisoners are not entitled to an absolute freedom to practice their faith. While this is true because religious freedoms may be regulated in line with reasonable penological interests, as stated above, this argument does not satisfy Defendants' burden of proving qualified immunity. The court finds Plaintiffs' right to exercise religious beliefs was sufficiently clear in light of prior decisional law. *See, e.g., Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Accordingly, Defendants' qualified immunity defense must fail.

■ The issue then becomes one of damages to be assessed against Defendants in their individual capacities. Section 1983 actions are intended to be "a species of tort liability." *Imbler v. Pachtmann*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that a Section 1983 plaintiff is entitled to recover only nominal damages absent proof of actual injury. Section 1983 plaintiffs must, therefore, prove "real" injury in the denial of their constitutional rights. The Court went on to state in *Carey* that if plaintiffs cannot prove actual injury, they are only entitled to nominal damages not to exceed one dollar. 435 U.S. at 266–67, 98 S.Ct. at 1053–54.

■ Plaintiffs in the present action have not submitted any evidence of actual injury resulting from their being prevented from exercising their religious beliefs. Plaintiffs have not, for example, alleged that they suffered any mental or emotional distress by being prevented from wearing their yarmulkes all day. The court, therefore, assesses damages against Defendants in the amount of one dollar consistent with the Supreme Court's decision in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

■ In contrast to an individual capacity suit, when an official capacity suit is brought, the action is essentially against the governmental entity of which the defendant is an official. Any damage award must be satisfied by the entity itself. To bring an official capacity action, the plaintiff must show that the entity's policy or custom played a part in the alleged violation of law. Personal immunity defenses are unavailable in official capacity actions. The Eleventh Amendment restricts the type of relief the plaintiff may recover. The Eleventh Amendment prohibits an order of damages against a State where the State would satisfy the damages award from its own funds.[6] Injunctive or declaratory relief that requires an official to conform his behavior to the requirements of the law in the *future* is not barred, however. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir.1987).

■ The problems giving rise to the cause of action in this case are similar to problems arising all over the State of Illinois in its Department of Corrections facilities. This court believes that many of these problems, and the resulting lawsuits, can be prevented if the State would develop statewide policies, in writing, dealing with the reasonable accommodation of Jewish inmates who desire to practice Judaism during their period of incarceration. As things stand now, policies, if one can label them "policies," are either non-existent or vague and are arbitrarily enforced in the Illinois prison system. Accordingly, Defendants are hereby ordered to submit to this court written guidelines concerning the accommodation of the exercise of Judaism among prison inmates. The guidelines are to be submitted within sixty days of this decision. The guidelines should be formu-

---

**6.** Accordingly, an order by this court to give "backpay" to rabbis in order to reimburse them for previous traveling expenses would be inappropriate.

lated so as to substantially meet the following goals:

1. A Jewish rabbi shall be paid by the prison authority travel expenses and other expenses comparable to that paid to chaplains of other faiths.

2. Jewish inmates shall be permitted to wear yarmulkes and other religious garments required by their law, at the appropriate times as required by Jewish law.

3. Religious articles used for services, including daily prayer, shall be available to Jewish inmates, upon request, for use by them in a facility at the prison.

4. Jewish religious holidays and the Sabbath shall be scheduled on the regular prison calendar.

5. A kosher diet will be available at all times, except in cases of major disturbances or calamities, but not administrative delay, and will be appropriately varied.

6. Jewish inmates may meet on their Sabbath with appropriate supervision by a staff member(s) or by a rabbi.

7. Jewish prisoners may not be required to work under the following standard: The more central the religious activity required by Jewish law is to their religious faith, the greater the presumption will be for the prison officials to relieve the inmate of any institutional program or assignment.

The court believes that this type of written guideline will prevent any continuing deprivation of an inmate's constitutional rights. Such a granting of relief was found to be appropriate in *Williams v. Lane*, 851 F.2d 867, 885 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

Finally, Congress has allowed prevailing plaintiffs in Section 1983 actions to recover reasonable attorney's fees under 42 U.S.C. § 1988. Accordingly, Plaintiffs' counsel are to submit to this court a statement of attorney's fees along with supporting affidavits.

CONCLUSION

For the reasons set forth above, the court awards Plaintiffs damages against Defendants in their individual capacities in the amount of one dollar. Defendants are given sixty days to submit to this court written guidelines concerning the accommodation of the exercise of Judaism among prison inmates formulated consistent with this decision. In addition, the court awards Plaintiffs costs and attorney's fees. Plaintiffs' counsel shall have until April 3, 1989 to file their bill of costs and fees.